## S. & M. Allen *vs.* The Merchant's Bank of the City of New-York.

A *bank* receiving for *collection* a bill of exchange drawn here, upon a person residing in another state, is *liable* for any neglect of duty occurring in its collection, whether arising from the default of its officers here, its correspondents abroad, or of agents employed by such correspondents.*

This liability may be varied, however, either by *express contract* or by *implication* arising from *general usage* in respect to such paper ; it is competent, therefore, for the bank to show an *express contract*, varying the terms of its liability, or in the absence of a judicial determination upon the point, to show that by the *usage* and *custom* of the place, a bank thus receiving foreign paper is liable only for its safe transmission to some competent agent, and is not responsible for the acts or omissions of such agent, or of any subordinates employed by him.

The inquiry, however, in such case is not as to the *opinion* of merchants, however general, as to the law of the case, but as to the *usage* and *practice* in respect to such transactions, or the *general understanding* of merchants as to the nature of the contract evidenced by their acts, so as to enable the court to give the contract a correct interpretation.

Where a debt was lost by the omission of a notary to give notice of the nonacceptance of a bill presented before maturity, IT WAS HELD, not to excuse a bank which had received the same for collection, that, by the *law merchant* of the place where the bill was presented, *notice of non-acceptance* was deemed unnecessary ; but that on the contrary, as the *lex loci contractus* governed in a case like it, it was the duty of the bank to have given the necessary instructions to its correspondents.

The omission to give notice of non-acceptance happening through the default of a *commissioned public officer*, a notary, does not vary the rights of the parties : *pro hac vice*, he acted merely as the *agent* of his employers, and not in his *official capacity.*

---

*Upon the principal point decided in this case, the court divided 14 to 10. Senator VERPLANCK, delivering an opinion for *reversal*, in which he was supported by *thirteen* of his brethren, and the CHANCELLOR delivering an opinion in favor of an *affirmance* of the judgment of the supreme court and *nine* senators concurring with him. It is worthy of remark, that in a late case, decided in the supreme court of errors of the state of *Connecticut*, the report of which was published probably since the argument in this court, the same doctrine was held by the judges of that court that was held by the supreme court and by the chancellor of this state as to a bank receiving a note for collection, not being liable for the default of a foreign agent : see *East Haddam Bank* v. *Scovil*, 12 *Conn. R.* 303.

ERROR from the supreme court. This was an action of *assumpsit*, brought in the superior court of the city of New-York by S. & M. Allen against the bank, to recover the amount of a bill of exchange, drawn in *New-York* on a mercantile house in *Philadelphia*, and deposited by the plaintiffs with the *Merchants' Bank* in New-York for collection, which was lost to the plaintiffs in consequence of the *omission to give notice of non-acceptance* to the endorsers. On 26th June, 1830, F. I. Spooner, at the city of New-York, drew a bill of exchange on Messrs. Boller & Baker, of Philadelphia, for $600, payable five days after date to his own order. He endorsed the bill to James M. Gould, who sold it to the plaintiffs and endorsed his name upon it. The plaintiffs, on the day of its date, deposited the bill *for collection* with the *Merchant's Bank*, who sent it to the *Philadelphia Bank* in the city of Philadelphia. On 28th June, the Philadelphia Bank delivered the bill to its notary, who, on the same day, presented it to the drawers for acceptance, which being refused, he *noted* the bill for non-acceptance, and returned it to the bank, *but omitted to give notice of non-acceptance to the endorsers of the bill.* On *Saturday*, the *third* day of *July*, it was again delivered to the notary, to be presented for payment; it was presented, and payment being refused, the notary protested the bill and sent notices of non-payment per mail, under cover, to the cashier of the Merchant's Bank, directed to the drawer and the Messrs. Allen. On the *sixth* of July, the Messrs. Allen received the notice of non-payment, and on the *seventh* gave a similar notice to *Gould*, the endorser. The plaintiffs brought a suit against Gould, and *failed*, on the ground of want of notice to him, of the *non-acceptance* of the bill, and they then commenced their suit against the Merchants' Bank, claiming to recover the amount of the bill, and the costs and charges of the suit against Gould, notice of that suit having been given to the Merchant's Bank, and their aid requested in the prosecution. The plaintiffs proved that Gould held securities in his hands deposited with him by Spooner to ensure the payment of the bill, which he surrendered after sufficient time had elapsed

Allen v. Merch. Bank of New-York.

to receive notice of non-acceptance. Spooner became insolvent on the *second* day of *July*. The plaintiffs attempted to prove a *usage* or *custom* in the city of New-York that when the banks there receive a bill or note for collection, payable out of the city, they become responsible for the diligence of the banks to which they transmit the bill or note, and also for that of the agents employed by such banks in the taking of the necessary measures to charge the parties to the bill or note, in case of its dishonor. They accordingly called a number of *merchants* and *brokers*, who testified that such was their *understanding* of the matter, and such their *opinion* as to the obligation incurred by the banks. On the other hand, a number of officers of the banks in the city of New-York testified that such was *not* the *understanding* of the banks; that the receiving of negotiable paper, payable out of the city, for collection, was deemed a favor to the customers of the banks; and that the only obligation incurred by the banks in such cases was, to transmit the paper to proper agents in due season for collection. The plaintiffs, wholly failed to prove any thing like a *usage* or *custom* recognized by the banks, by their acknowledgement of liability and payment of losses incurred through the want of diligence of the banks to which negotionable paper was transmitted, or the want of diligence of the agents employed by such banks. On the part of the defendants, it was proved that the Bank of Philadelphia, and the notary employed by it, were distinguished for punctuality and diligence in the transaction of business: and further, that by the *law merchant of Pennsylvania*, it is not necessary to present a bill or note like the one in question for *acceptance*, and to give notice of non-acceptance, for the purpose of charging the parties to such bill or note; that it is sufficient if it be presented at maturity for *payment*, and if not paid, that notice of non-payment be given.

Mr. Justice *Oakley* charged the jury, that the defendants, upon general principles of law, and independent of any custom or usage, or of any agreement, express or implied, were only bound to transmit the bill to Philadelphia in due time and to some competent agent; and were not liable for any

negligence or omission of such agent in giving notice of the *non-acceptance* of the bill. That it was the duty of the jury to inquire whether such usage or custom existed in the city of New York as was alleged on the part of the plaintiffs, and in weighing the evidence which had been given, they must distinguish between a *usage* or *custom*, and any *general understanding* on the subject, which prevailed among men of business in the city; that to establish the usage or custom claimed by the plaintiffs to exist, it must appear that the practice of the banks had been generally in conformity to such alleged usage, and for so long a period as to have become generally known; that it did not appear to him, from the evidence, that there had been any such practice on the part of the banks, as no case of the kind had before occurred; but it was for them to determine whether any such practice or usage existed. If they should find that such usage or custom did not exist, they would then inquire whether there was any *mutual understanding* or any agreement between the defendants and their dealers generally, or between them and the plaintiffs particularly, that they were or would be responsible for the conduct of the bank or notary abroad in cases of this kind; that if they should find that no such understanding or agreement existed, then the defendants were not liable, although the jury should find that a general and notorious understanding existed among men of business in the city of New-York that the banks there were responsible in the manner claimed by the plaintiffs. To this charge the plaintiffs excepted. The jury found for the defendants, on which judgment was entered. The plaintiffs removed the record into the supreme court, where the judgment of the superior court was *affirmed*. See the opinion of the court delivered by the Chief Justice, 15 *Wendell,* 486, et: *seq.* The plaintiffs thereupon sued out a writ of error, removing the record into this court.

*H. E. Davies,* for the plaintiffs in error, insisted that the *Merchant's Bank,* by receiving the bill *for collection,* assumed the duty of giving notice of *non-acceptance,* and was responsible for the omission of the *agent* employed by the

*Philadelphia Bank.* In support of this proposition, he cited *Van Wert* v. *Woolley*, 3 *Barn. & Cres.* 439. He contended that the case of *The Bank of Washington* v. *Triplett & Neale*, 1 *Peters*, 50, did not support the decision of the supreme court of this state, inasmuch as there the draft was left with the *Alexandria Bank*, only for *transmission* and not for collection. He also insisted that the evidence fully proved a *usage* rendering the defendants liable, and that the evidence of such usage was properly received.

*H. P. Edwards & G. Wood*, for the defendants in error, insisted upon the following points:

I. The defendants in error, having selected, a foreign bank in Philadelphia, *in good general credit*, are not responsible for the alleged default or omission in question in this cause, by the established and uniform usage in regard to the banks in the United States, recognized by judicial decisions. *Bank of Washington* v. *Triplett and others*, 1 *Peter's R. (U. S. Supreme Court,)* 30. *Stone and others* v. *Cartwright*, 6 *T. R.* 411. *Smedes* v. *Utica Bank*, 20 *Johns. R.* 384. *Woolrych's Commercial Law, p.* 320.

II. The Bank of Philadelphia, (and *a fortiori*, the defendants in error,) is not liable for the default of its notary in a particular case, where (as in the present case,) his general character is good, and the bank is in no default in the selection and continuance of the officer. *Smedes* v. *Utica Bank*, 20 *Johns. R.* 384.

III. The notary was not guilty of any negligence or misfeasance in omitting to give notice of the *non-acceptance* of the bill in question—it not being required by the common law, as interpreted in Pennsylvania. A bailee is required to use only the same diligence which a prudent man would use in his own concerns, and is not answerable for mistakes of law in doubtful cases, which, with ordinary care, could not be avoided. *Baike* v. *Chandles*, 3 *Camp. N. P.* 17.

IV. The judge, who presided at the trial of this cause, was warranted in charging the jury that, upon general prin-

ciples of law, the Merchants' Bank was only bound to transmit the bill in question, in due time, to a competent agent in
Philadelphia; and was not liable for any neglect or omission
on the part of such agent, in giving notice of the non-accept-
ance of the bill.

V. There is no *special usage* in the city of New-York, creating a liability repugnant to the foregoing principles.

VI. The opinions of men of business, dealers with banks
in the city of New-York, as to the true legal construction of
a contract or transaction, cannot alter the legal operation
thereof.   *Trott and others* v. *Wood.* 1 *Gallison's R.* 444.
*Smith and others* v. *Wright and others,* 1 *Caines,* 43, 45.

VII. Although the opinion or understanding of dealers in
a trade, as to the meaning of *terms,* or other matters relating
to their business, *which are constantly occurring in practice,*
may be evidence of such *practice,* and consequently of *their*
*usage;* yet their abstract opinion in relation to a legal liability which has never been enforced or submitted to in practice, is no evidence of *usage.*

VIII. If general opinion or understanding, as to what the
law is, constitutes *a usage* or practice, sufficient to establish
the law, then the usage in question is established in favor
of the defendants in error; inasmuch as it is the *usage of*
*the banks* in cases of doubt or difficulty, which guides the
court in settling the law.   *Renner* v. *Bank of Columbia,* 9
*Wheat.* 581.   *Mills* v. *Bank of the U. States,* 11 *id.* 431.
*Bank of Washington* v. *Triplett and others,* 1 *Peters,* (*U.
S.*) 25.

*S. A. Foot,* in reply.   The Merchants' Bank by receiving
the bills for *collection,* are deemed in law to have promised
to do all such acts, as should become necessary to enable
the owners of the bill to enforce their remedy against the
parties thereto.   Admitting the plaintiffs knew the ordinary
course of business to be that the bank here would send the
bill to its correspondents in *Philadelphia* to have it presented for acceptance and payment, the employment of such
agents, was the act of the bank, which became responsible
for the diligence and fidelity of its agents.   The owners of

Allen v. Merch. Bank of New York.

the bill took no part in their selection or appointment, and such agents, in general, are responsible only to their employers. *Story on Agency*, 15, 16, 189, 208. The holders of the bill surely are not compelled to resort to them for their remedy, and it is even questionable whether they could have sustained an action against them. 3 *Barn. & Adolph.* 354. The benefit received by the bank, in obtaining a credit in Philadelphia, in the way of exchange to the amount of the bill, was a sufficient consideration for its undertaking. It is no excuse that by the law merchant, as understood in Philadelphia, it was not necessary that notice of non-acceptance should be given. The contract having been made in New-York, the *lex loci contractus* governed, and the bank should have given the necessary instructions to its agents in Philadelphia. A bank with which a note is left for collection, is liable for neglect or for the employment of an incompetent agent, *Smedes* v. *Utica Bank*, 20 *Johns. R.* 384, and is consequently answerable for the omission of its agents to give notice of non-acceptance. 3 *Barn. & Cres.* 439. The case of the *Bank of Washington* v. *Triplett & Neale*, 1 *Peters*, 50, decides nothing as it respects the question here involved. The court there only held that the *Bank of Washington* was liable, but said nothing as to the *Bank of Alexandria*. The proof of *usage* in this case, was sufficient to charge the defendants, 20 *Johns. R.* 378.

After advisement the following opinions were delivered :

By the CHANCELLOR. The questions arising upon the writ of error in this case, are of very great importance to the mercantile community, and I regret that the very great press of business in this court has allowed us so little time to examine them in all their various bearings. The object of the suit is to charge the defendants with the amount of a bill of exchange left with them for collection, and which has been lost to the plaintiffs in consequence of an imperfect negotiation of it, whereby the endorser was discharged from his liability to them as the endorsees.

It is the settle law of this state that a bill of exchange which is payable on a day certain, or a certain number of

days after date, need not be presented for payment before it becomes due in order to charge the drawer or endorser— and such is also the law of England, and of Scotland, and of France, although it is the duty of an agent who holds such a bill for the purpose of negotiation, to endeavor to obtain the acceptance thereof without delay, *for the benefit of his principal,* who has an interest in having it accepted immediately. But if such a bill is actually presented for acceptance before it becomes due, and the drawee refuses to accept, notice of the dishonor of the bill must be immediately given to the drawer and endorsers, or they will be discharged. 17 *Wend. Rep.* 368 ; 1 *Durn. and East Rep.* 712 ; 2 *Peters' Rep.* 170 ; *Morr. Dict. of Decis.* 1494, 1558; 2 *Pardes, Droit Com.* 417, *No.* 358; 3 *Kent's Comm.* 82 ; 1 *Chitty, Jun. on Bills,* 38, 46 ; *Muir on Bills,* 22 ; *Bayles on Bills* 102. It appears by the testimony in this case, however, that by the mercantile law of *Pennsylvania* it is not necessaay to give notice of the non-acceptance of a bill of exchange, whether it is payable on a day certain or otherwise ; and one ground of the plaintiff's claim in this case is, that the defendants neglected to inform the bank of Philadelphia, to whom the bill was sent for negotiation and collection, that by the law of this state notice of the non-acceptance of the bill would be necessary to charge the drawer and endorsers who resided here.

A great portion of the mercantile law of this country as well as of England, has been derived from mercantile usages, which have from time to time incorporated themselves with and finally become settled rules of the common or unwritten laws of both countries. But the court below was unquestionably right in charging the jury that the opinions of merchants and men of business, as to the legal liability of the banks in New-York, for the neglect of the foreign bank in duly negotiating bills sent to them for collection, was not legal evidence to prove mercantile usage. The custom of merchants or mercantile usage does not depend upon the private opinions of merchants as to what the law is, or even upon their opinions publicly expressed—but it depends upon their acts: Or, as the learned chief justice

very correctly says, the inquiry in such cases is not after the *opinions* of traders and merchants in respect to the *law* upon a mercantile question, but for the evidence of a *fact*, to wit, the usage or practice in the course of mercantile business in the particular case. In the case of *Carvick* v. *Vickery,* 2 *Dougl. Rep.* 653 *n.,* the offer of the counsel for the defendant was not merely to prove the understanding of mercantile men as to the necessity of a note being endorsed by all the payees of a bill, who were not copartners, in order to render it negotiable; but to prove the universal *usage* and understanding of bankers and merchants. That is, to show by their acts, in refusing to receive or pay bills which were not endorsed by both payees, the usage and understanding of the mercantile community on the subject. It was this usage or practice of merchants and bankers which the witness in that case was called to prove; and which the special jury of merchants, who were empanelled to try the cause, declared they knew to exist, as stated by the counsel. The evidence of merchants or of other persons engaged in a particular trade or business, is frequently resorted to by courts of justice for the purpose of ascertaining the sense in which certain *words* or *mercantile terms* are used in commercial contracts. And accordingly in *Powell* v. *Horton,* 2 *Hodge's Rep.* 16, justice Vaughan says: "evidence has always been received to show in what sense mercantile terms are used." But this is not a case of that description.

The usage attempted to be established in the case now under consideration, is a usage that the bank in which a note or bill payable at a distant place is deposited for collection, shall be answerable for the neglect of the foreign bank or agent, to whom the bill or note is sent to be collected, in duly negotiating the same. But how can such a usage be established unless the question has before arisen, by a claim for compensation for such a loss, and by the acquiescence in such claim on the part of the bank. Evidence showing that a bank had paid such a loss in a single case, is not sufficient to establish a commercial usage. Proof of the *general usage* of the banks to make compensation for such

losses, or of the receipt by them of a compensation, in the nature of a *del credere* commission, upon the assumption that they are liable for the negligence of their corresponding banks or agents, appears to be the only way in which such a customary or implied liability can be established, in the absence of any general rule of commercial law upon the subject.

It is a general rule of law, that banks and other corporations, as well as individuals, are liable for the acts or omissions of their general officers and servants, in relation to any business entrusted to the corporation or individual to be transacted. But this rule does not apply to a case where from the nature of the business to be performed, it cannot be done by any of the ordinary officers or servants of the corporation or individual, but must be entrusted to a sub-agent employed for that special purpose; or where by the usages of trade it is customary to employ a special agent for the purpose of transacting the business. Here, from the very nature of the business to be transacted, and from the general usage in such cases, it was necessary to employ a bank or other agent in Philadelphia for the special purpose of negotiating this bill of exchange, and of receiving the payment thereof, if it should be duly honored. *Prima facie* the risk of the neglect of such foreign bank or other special agent to negotiate the bill properly, should be upon the owner of the bill who has impliedly authorized the employment of such special sub-agent. I admit that if it had been the custom of the banks to receive a commission or compensation for the collection of such bills and notes, beyond the difference of exchange between the two places and the actual expenses of negotiation, it might very properly have been considered as in the nature of a *del credere* commission, so as to render such banks legally liable for the loss which might be occasioned by the negligence or misconduct of their corresponding banks or agents. The incidental benefit which the bank in New-York might receive, in having the money collected through that institution, from the chance of its remaining there as a deposit for a short time after it was collected, was undoubtedly a sufficient consid-

eration for an implied agreement on the part of the bank, that the bill should not be lost to the plaintiffs by reason of any negligence on the part of the bank or of its officers or servants ; and such was the decision of this court in the case of *The Bank of Utica* v. *McKinster,* 11 *Wendell,* 473. But it certainly would be going very far to say that this mere chance of benefit to the bank was in fact a *del credere* commission, from which an agreement to warrant the plaintiffs against loss from the mistakes and negligence of the corresponding bank or agent, could legally be inferred. I therefore conclude, that there was nothing in the law or in the facts of this case, which could entitle the plaintiffs to recover against the defendants, on the ground that the bank in New-York was answerable for the negligence of the Philadelphia bank or its notary to give notice of the dishonor of the bill, when it was returned to that bank, on the day of its presentment noted for non-acceptance.

It was probably the duty of the defendants when they sent the bill for negotiation and collection to a state where they did not know the law to be the same as ours in relation to notices and protests, to have given the necessary instructions to their correspondent bank on the subject, so that the drawer and endorsers might be duly charged according to our laws, in case of the dishonor of the bill. Where the owner of a bill endorses it and delivers it to another for collection, or delivers it to him for collection after it has been previously endorsed in blank, he thereby constitutes the person who receives it his agent, for the proper negotiation of the bill, as well as to receive payment thereon when it becomes due ; and the law implies a corresponding duty on the part of the agent who receives it. If the bill, therefore, has not been accepted, it is the duty of the agent to see that it is presented for acceptance, and that the proper protests and notices are given in case of its dishonor, as well as as to see that it is presented for payment when it becomes due. *Poth. Traite du Contr. De Change, ch.* 4, *No.* 82. And such was the decision of this court in the case of these *same plaintiffs against Boyd & Suydam,* at the last December term of this court. 20 *Wendell,* 321. Where

an agent, therefore, receives such a bill to be sent to a foreign state or country for collection, it is his duty to give the necessary instructions to such sub-agent, to enable him to negotiate the bill in such a manner, as to charge the drawer or endorsers according to the law of the state where the bill is made or endorsed. It now appears to be the settled law, notwithstanding the opinion of Mr. Justice Van Ness in the case of *Miller* v. *Hackley*, 5 *Johns. R.* 375, that a bill drawn in one state, and payable in another where the rules of law may be different, is to be considered as a *foreign bill. Buckner* v. *Finley*, 2 *Peters' R.* 586. *Duncan* v. *Course*, 1 *Mill's Const. R.* 100. *Lonsdale* v. *Brown*, 4 *Wash. C. C. R.* 148. Such also is the rule of law as to bills drawn in England payable in Scotland, or Ireland, or one of the British colonies, and *vice versa. Salomans* v. *Stavely*, 3 *Doug. R.* 298. *Mahoney* v. *Ashlin*, 2 *Barn. & Adol.* 478. *Reynolds* v. *Syme, Morr. Dict. of Dec.* 1598. *Muir on Bills*, 52. 3 *Kent's Comm.* 82. An agent is always understood to contract for reasonable skill and ordinary diligence in the discharge of his duties, that is, the usual skill belonging to other persons engaged in the like business, and the degree of diligence which prudent men exercise in relation to their own business. The employer has the legal right to the exercise of that degree of skill, and that extent of diligence, on the part of the agent ; and if the latter has not the requisite skill, or having it, neglects so to use it, he is liable to his employer for the consequences of his ignorance or neglect. But as a general rule, an agent who conducts the business with which he is entrusted by his principal, according to the ordinary custom and usages of all other persons engaged in the like employment or business, is not answerable to his principal, although a greater degree of diligence, by an unusual departure from the accustomed usage in such cases, might have prevented the loss which has occurred ; unless there was something in the circumstances of the particular case to make it his duty to depart from the ordinary mode of transacting the business and to adopt an unusual degree of vigilance to protect his employer from loss. In the present case it was in evidence that the transmission

of bills between New-York and Philadelphia was a matter of constant occurrence ; and that the bank of which the witness was cashier, never sent instructions when they sent a bill abroad for collection. Under all the circumstances of this case, the jury were the proper judges of the fact, whether the defendants had departed from the usual course of business, or had been guilty of negligence in not sending specific instructions to their corresponding bank in Philadelphia, to have the bill protested for non-acceptance as well as for non-payment. If the plaintiff's counsel had wished any specific instructions to the jury as to the law on that subject, he should have called upon the court to charge on that point, so that if the judge who tried the cause had declined to do so, the fact might have been stated in the bill of exceptions. Without expressing any opinion, therefore, upon the question of fact arising upon the third count of the plaintiff's declaration, I have arrived at the conclusion that it does not appear from this bill of exceptions that there was any misdirection in point of law in the court below ; or that the judge who tried the cause neglected to give the proper instructions to the jury upon any question of law to which his attention was called by the counsel for the plaintiffs in error.

For these reasons I shall vote for an affirmance of the judgment of the supreme court.

By Senator VERPLANCK. Payment of a bill of exchange was lost to the holders in consequence of the omission of giving notice of refusal to accept. Assuming for the present that such omission was a culpable and unjustifiable neglect, let us first proceed to the consideration of the chief and more important question in this cause.

A bill of exchange drawn in New-York upon a person resident in Philadelphia is deposited *for collection* in a New-York bank, is received for that purpose, and duly transmitted to their correspondent and agent, a Philadelphia bank, the notary of which is guilty of a neglect, whereby on refusal to accept at Philadelphia, payment from the New-

York drawer or endorser is lost. Is the New-York bank first receiving this paper for collection, responsible for the loss or damages arising from the default of its Philadelphia agent?

Viewing this as a question of very great importance, both in itself as relates to the responsibilities of our moneyed institutions, and the usage of commercial collections, and also as materially affecting the general law of agency and contracts, I have given the subject much consideration. The conclusions to which I have come are in opposition to the opinion of the supreme court, as well as to the charge of the eminent judge before whom the cause was tried in the court below. I have consequently hesitated in forming my judgment, and have repeatedly reviewed the question before giving this opinion. But I cannot now entertain any doubt on this subject.

It is well settled in this state that there is an implied undertaking by a bank or banker receiving negotiable paper deposited for collection, to take the necessary measures to charge the drawer, maker or other proper parties, upon the default or refusal to pay or accept. *Smedes v. Bank of Utica,* 20 *Johns. R.* 372, and *S. C. in this court,* 3 *Cowen,* 663. *McKinster v. Bank of Utica,* 9 *Wendell,* 46. 11 *id.* 473 *S. C.* The ground of this rule is, that the acceptance of negotiable paper thus deposited for collection, forms an implied undertaking to make the demands and give the notices required by law or mercantile usage for the perfect protection of the holder's rights against all previous parties; for which undertaking the use of the funds thus temporarily obtained or of the average balances thereof, for the purposes of discount or exchange forms a valuable consideration. Had we no express authority on this head, I should consider the acceptance by a bank of paper for collection from a customer, in the usual course of his business, as sufficient evidence of a valuable consideration. The whole ordinary business of a bank with its dealers, is one of mutual profit or accommodation, and must be taken together (unless some part is separated by express understanding) and it is not for a bank to allege or for a court to consider (as the chief jus-

tice seems to do,) that a collection in a particular place must be regarded as a gratuitous favor. If accepted at all, the general profits and advantages of the business of which this may perhaps be an unproductive part, form a good consideration for the undertaking. This, however, is not an open question after the decision of this court in the two cases against the Bank of Utica.

What then is the ordinary undertaking, contract or agreement of a bank with one of its dealers, in the case of an ordinary deposite of a domestic note or bill, payable in the same town received for collection? It is a contract made with a corporate body having only a legal existence, and governed by directors, who can act only by officers and agents; or if it be with a private banker, he too is known to carry on his business by clerks and agents. The contract itself is to perform certain duties necessary for the collection of the paper and the security of the holder. But neither legal construction nor the common understanding of men of business can regard this contract (unless there be some express understanding to that effect,) as an appointment of the bank as an attorney or personal representative of the owner of the paper, authorized to select other agents for the purpose of collecting the note and nothing more. There is a wide difference made as well by positive law as by the reason of the thing itself, between a contract or undertaking to do a thing, and the delegation of an agent or attorney to procure the doing the same thing—between a contract for building a house (for example,) and the appointment of an overseer or superintendent, authorized and undertaking to act for the principal, in having a house built. The contractor is bound to answer for any negligence or default in the performance of his contract, although such negligence or default be not his own, but that of sume subcontractor, or under workman. Not so the mere representative agent, who discharges his whole duty if he acts with good faith and ordinary diligence in the selection of his materials, the forming his contracts and the choice of his workmen. Now in the case of the deposite for collection of a domestic note or bill payable in the same town, no one

can imagine that this instead of being a contract with the bank to use the proper means for collecting the paper; is a mere delegation of power to act as an attorney for that purpose. If this were so, and it should happen that by the fraud, the carelessness, or the ignorance of a clerk or teller, the only responsible parties were discharged, or the note itself lost or destroyed, it would be a sufficient defence for the bank if it could shew that the directors had employed ordinary care and caution in selecting their officers: or any similar defence which would be good in the mouth of an attorney in fact, or a steward acting in good faith for his principal, who had been defrauded in any transaction. If such were the understanding of this business, and the merchant had to look to the responsibility of the teller or clerk through whose hands his paper may pass, and not to that of the bank which employs them, few deposites for collection would be made, and it would soon be found expedient to deal only with banks or bankers who would guaranty their officers. But the natural and general understanding of men of business is surely not this; it is that of an implied agreement with the bank itself, of whose officers and agents they have no knowledge, and with whom they have no privity of contract.

The decisions of our own courts, above cited, call this transaction a contract, and treat it as such. Then the law is clear, that by the employment of under agents or servants, for his own convenience or to perform part of what he has contracted to do, the employer becomes civilly responsible to those with whom he contracts or deals in his business. The general principle of Lord Holt has always been cited with approbation, though the correctness of its application to a political office was denied, that "where a trust is put in one person, and he whose interest is intrusted is damnified by the neglect of such as that person employs in the discharge of that trust, he shall answer to the person damnified." 12 *Modern R.* 490. The same doctrine is thus summed up by judge Story, from a long succession of authorities: "It is a general doctrine of law, that the principal is held liable to third persons in a civil suit for the frauds,

deceits, misrepresentations, torts, negligences, and other mal-
feasances or misfeasances and omissions of duty of his agent in
the course of his employment, although the principal did not
authorize or justify, or indeed know of such misconduct, or
even if he forebade them or disapproved of them." *Story on
Agency, ch.* 17, § 452, and authorities cited in note 3. " The
maxim is," says Lord Kenyon, " *Respondeat superior*—The
principals are responsible for the acts of the servants in
those things that respect their duty under them, though
not answerable for things that do not respect their duty."
8. *T. R.* 531. This rule sums up the dotrine with great
force, clearness and precision. Thus the carrier is liable
for the negligence of his agent, by which goods committed
to his care are damaged. So the ship ower is liable to
the shipper for damages caused by reason of the neglect or
misconduct of the master or mate. ."This liability," says
Judge Story, " extends not only to the injuries and wrongs
of the agent immediately employed in a particular business,
(as in this case to the Merchant's Bank itself,) but also to
the injuries and wrongs done by others who are employed
by that agent under him, or *with whom he contracts* for the
performance of the business; for the liability reaches
through all the stages of the service." *Story on Agency,* §
454, and cases there cited in note. It is this distinction, on
which I have already insisted as founded in the reason of
contracts, between the undertaking to perform any thing,
and the mere receiving a delegation of authority to act for
another, which reconciles many decisions evidently equally
just in themselves, but apparently clashing in words and con-
flicting in authority. I include among these, in addition to
the class of cases already cited or referred to, those in which
persons dealing or contracting with an agent or contractor,
and trusting to his credit, have endeavored to charge his
principal, with whom, however, they themselves had no
privity ; see for instance, the two cases in 6 *Taunton,* 147,
148. If it be not a mere representative agency, but a con-
tract or undertaking to do the business, the original principal
is answerable ; and for the same reason he is too look to the
immediate contractor with himself, and not to the inferior

and distant under contractors or agents, for defaults injurious to his own interest.

Such then being the general law, the bank, in undertaking to collect negotiable paper, is answerable for the neglect of its ordinary agents. Is there any thing in the mere fact of the paper being payable in another city, and therefore requiring the aid of other agents, sufficient to take that case out of the general rule ? I mean irrespectively of any agreement or implied understanding as to the matter. The chief justice, in delivering the opinion of the supreme court, holds that there is, and says : " A note or bill left at a bank, and received for the purpose of being sent to some distant place for collection, would seem to imply, upon a reasonable construction, no other agreement than that it should be forwarded with due diligence to some competent agent, to do what should be necessary in the premises. The language and acts of the parties fairly import so much, but nothing beyond it. The person leaving the note is aware that the bank cannot personally attend to the collection, and that it must therefore be sent to some distant or foreign agent." This seems to me to assume the very question in dispute. In a deposite of a note for collection, payable in the same place, the holder is equally aware that the bank cannot personally attend to the collection, and its management must be left to some one or more competent agents. But he makes an implied contract with the bank that the proper and expedient means shall be used to collect his note. So he does as to a foreign debt ; and in each case he alike presumes that proper agents will be employed. In neither case has he any knowledge of the agents, or privity with them. I can perceive no reason for liability or exemption from liability in either case which does not equally apply to the other. The bank, if its officers think fit, and the dealer will consent, may vary that liability in either case. It may receive the paper only for transmission to its correspondents. That would form a new and different contract, and would limit the responsibility to good faith and due discretion in the choice of an agent. But if this be not done, or unless there be some implied understanding on the sub-

Allen v. Merch. Bank of New-York.

ject, I see no difference between the responsibility assumed in the undertaking to collect foreign bills, and that for collecting domestic paper, payable àt home.   It is assumed in the same manner, in the same words, and on the same consideration.   If the reasoning of the supreme coùrt be correct, I cannot perceive how, either in the case of domestic collection, or in any other case, the principal is to be made liable for the default of his own agent, if, from the nature of the business, it was evident that some under agent must be employed, and that the principal could not do the business without aid.   On this principle, the ship owner would not be answerable for the negligence of the captain, whom all the world knows he must employ.   The master mechanic who must (as those who contract with him are well aware) employ sub-contractors, journeymen and laborers, would no longer be liable for their negligence in the work he contracts to have executed.   The same reasoning which would here make the New-York bank merely an agent " to select other agents abroad for the party to become his agents in the collection," would equally make the ship owner and the contracting builder mere agents to select masters, mates, journeymen and laborers for those with whom they deal. If it be " unreasonable " to suppose, as the chief justice holds, that the bank assumed " to become responsible for the fidelity of agents abroad," who " all parties knew must intervene before collection," and when the plaintiffs " knew that others must be trusted," it must be quite as unreasonable in the case of domestic collections, and of all other transactions, where the parties know that " agents must intervene and others be trusted."   But in all these cases, the parties are not governed by the mere rule of personal representative agency, but are subject to the responsibilities imposed by the law of commercial contracts, of bailment or of shipping.   In all these cases, we are not too look to the necessity of the employment of the distant or under agents. We are to look to the contract itself.   *Legèm enim contractus dat.*   We are to look whether the contract be only for the immediate services of the agent, and his acting faithfully as the representative of his principal, doing for him, in the

business confided to his care, what the principal is not able or willing to do for himself, or whether the contract looks mainly to the thing itself to be done, and the undertaking be for the due use of all the proper means for its performance. In the one case, the responsibility ceases with the limits of the personal services undertaken; in the other, it extends to cover all the necessary and proper means for the accomplishment of the object, by whomsoever used or employed.

Again: it is not true, in the usual and well known course of trade, that there is no other agreement implied than that deposited paper payable abroad shall be forwarded with due diligence, or as Judge Oakley charged, that "the banks are only bound to transmit such paper in due form and in due time." By the known ordinary usage of business, unless, when altered by some special agreement or usage, the banks undertake something more than this. This the holders of paper could do for themselves. But the banks also undertake to receive and pay the funds here, when collected elsewhere. The foreign bank does not know the owner of the bill so as to open an account with him, and to authorize him to draw upon his funds when collected. They know only the bank from which the paper was received, and that bank has at least undertaken to manage the business of exchange between the places; on what ground then is the bank receiving for collection, to be answerable only for the first and last stages of the transaction, and to be discharged from any liability as to all intermediate steps.

Such are my views of the general principles involved in the case. Let us now look to the authorities bearing or supposed to bear upon it.

The chief justice relies much upon the decision of the supreme court of the United States, in the *Bank of Washington v. Triplett & Neale, 1 Peters, 25,* and on the reasoning of Chief Justice Marshall, in delivering the opinion of the court. He said, in that case, " that the bill was not delivered to the Mechanics' bank at Alexandria for collection, but for transmission; that the bank in Washington became the agent of the holder; that the bank in Alexandria performed

its duty by transmitting the bill, and the whole responsibili-
ty of the *collection* devolved on the bank which received it
for that purpose." Unquestionably it was so in that case;
for that was the express contract between the parties. The
case does not state that the bill, payable at Washington, was
deposited for collection in the Alexandria bank, but it ex-
pressly states that "the holder of the bill placed it in the
hands of the cashier of the Alexandria bank, *for the purpose
of being transmitted to the bank at Washington for collec-
tion.*" It no where appears, or is alleged, that the bank at
Alexandria had made any undertaking, express or implied,
to *collect* the paper. This might be from the known course
of business in the District of Columbia, or it might be from
the express agreement as to this paper, or from the manner
in which the bank received the paper: that does not ap-
pear, but the fact, nevertheless, it admitted. The Washing-
ton Bank received instructions from the holder and replied
to him. Of course, there is nothing in the views I have
taken of the general question which is contradicted by the
conclusion of Chief Justice Marshall, "that the bank of Wash-
ington, by receiving the bill for collection, and *by its letter*,
became the plaintiff's agent, and assumed the responsibilities
of that character." Under these circumstances, I consider
the authority of the supreme court of the United States, in
this decision, as indirectly, at least, in opposition to the doc-
trine of the supreme court of this state, and certainly as giv-
ing it no support.

On the other hand, a recent and equally high authority
goes directly to support the doctrine I have sustained. It
is the case of *Van Wart v. Wooley*, 3 *Barn. & Cress.* 419,
upon the authority of which, another great question of the
law of negotiable paper was decided in this court, during
the last year, in the case of *S. & M. Allen* v. *Suydam &
Boyd*. In *Van Wart v. Wooley*, the defendants at Birming-
ham received a bill upon London to get accepted. This
they forwarded to their London banker, who did not pro-
test the bill for non-acceptance, or give notice to any of the
parties to the paper of the rufusal to accept. Lord Ten-
terden, in delivering the judgment of the court, said: "Up-

on this state of facts, it is evident that the defendants, who *cannot be distinguished from, but are answerable for their London correspondents*, have been guilty of a neglect of the duty they owed the plaintiff, their employer, for which they received a pecuniary reward. . The plaintiff is therefore entitled to maintain his action against them to the extent of any damage he may have sustained by their neglect." The case embraced some other points, but the decision of all rested upon this position. Upon these authorities, and for these reasons, I am clear, that *by the deposite of the bill in question with the bank, and the receiving it for collection, the bank, upon general principles of law and independently of any custom or usage, or of any express agreement, is liable for a neglect of duty occurring in that collection, whether from the default of its officers here, or of their correspondents at Philadelphia*, from whom, (in Lord Tenterden's words,) " they cannot be distinguished, and for whom they are answerable."

Cannot that legal liability be varied? I cannot doubt that it may be, either by the express condition on which paper for collection is received, or by the implied understanding of the parties arising from the common understanding of merchants, and the custom of trade. It was, therefore, proper to admit the evidence of men of business to show what was the *usage* or *general understanding* of such transactions. I agree entirely with Judge Oakley as to the authority and object of such evidence. The opinion of merchants, however general, is no authority to shew the legal liability of any party. It is the exclusive province of the law to decide that point. But such evidence is good to shew the common understanding of any contracts, the meaning of the language of such contracts in their ordinary commercial sense, to prove any custom, usage or mode of business which may naturally and justly be presumed to enter into and form part of any transaction or agreement. It is good for the purpose of giving probable proof of the degree and kind of responsibility understood to be assumed by the party sought to be charged; but it is not good to shew what the legal consequences of the assumption of any

such responsibility may be.   It is good for the interpretation of the contract, not for the establishment or the exposition of the law.   Now, if the conclusions to which I have previously come, be sound, the direction of the judge at the trial as to this sort of evidence, though correct in his view of the weight and authority to which it was entitled, was wrong as to the point to which he directed the attention of the jury. He told them that the bank was not liable on general principles, and was not responsible, unless they were of opinion, from the evidence, that there was some agreement, express or implied, between the parties, in relation to the transmission of the bill, or unless there existed some custom or usage in the city of New York, changing the obligation imposed by the deposite, by which custom, banks receiving bills payable out of the city, are responsible for the negligence of any bank or notary, or other agent to whom such bills might be sent.   According to my view of the law, the reception of the bill for collection, in the usual manner, imposed the liability for neglect or omission of the proper means, by any one employed for that purpose by the banks or by its agents ; but it was open for the bank to shew, and it was for the jury to decide, whether there was not some express or implied agreement, or mutual understanding between the parties, which varied that obligation and limited the bank's responsibility, as to foreign bills, to the safe transmission to a competent agent ; or whether there did not exist some custom or usage in the city of New-York, discharging the legal liability as to bills payable abroad, in the same manner: which usage was sufficiently general, long continued, and known to men of business, to be presumed to have entered into and formed part of the contract.  ̄This distinction is not a matter of form or theory merely.   On the contrary, it might wholly change the verdict of the jury. In the case before us, though the great weight of commercial evidence appears to me to be on the side of the understood liability of the banks, there was enough from cashiers and experienced bank officers on the other side, to warrant the jury in finding, as they did, for the defendants; they, in fact, finding that there was no agreement or custom

*specially* charging the banks with a liability which the law would not otherwise impose. Had they been directed, as I think they should have been, that the bank was liable unless they thought that there was sufficient evidence of some agreement or custom discharging that responsibility, the verdict upon such conflicting evidence might well have been found for the plaintiffs.

In a question like this, involving principles that must govern the law of a wide range of commercial dealings, considerations of public policy cannot well be overlooked, though they must not be allowed to disturb the conclusions of natural justice or well settled positive jurisprudence. Some such considerations have been suggested in the course of the arguments, founded upon the great and inconvenient responsibilities which a decision reversing that of the courts below would impose upon our monied institutions; and their consequent withdrawal in part or in whole, from a business so necessary to our internal exchanges. To me the subject appears in a very different light. I cannot but think that if the law of this case were now to be settled, not judicially, but legislatively, upon considerations of public policy alone, the doctrine I have maintained in opposition to that of our courts, would be found the safest and wisest. If the present judgment be affirmed, no small doubt will be thrown upon the responsibilities of collecting banks and bankers, even in domestic collections, for the acts of any of their officers. As in the case of corporate banks, or those under our general law, all the business is practically done by agents, that doubt would cover the whole of our banking transactions. The same difficulty may arise in numerous analogous commercial affairs, the law as well as the usage of which is now settled, unless it be shaken by the influence and authority of decisions and reasoning like that of the supreme court in this case. On the other side, if we hold collecting banks and bankers to be liable for all neglect or omission of the necessary and proper means for the due performance of that which they have in general terms undertaken to do, whether such omission or negligence be their own or that of others in their employ—we preserve that harmony of the

law which is so essential to its being understood by those who are to regulate their dealings by it ; and unquestionably much doubt and litigation will be excluded. If the responsibility thus imposed be onerous or inconvenient as to foreign bills, or to any especial class of transaction, it is easy for banks and bankers to avoid that inconvenience by stating the terms upon which they will receive the deposited paper. A notice to customers and dealers, or a different mode of entry in the bank books of the notes received for collection, and those for transmission only, will put an end to all future questions, and discharge any such responsibility—or, it might be assumed, if considered as a valuable though somewhat hazardous branch of business, for any reasonable and adequate compensation.

II. The second point, though essential to the decision of the cause, is of less general interest, and I shall speak of it more briefly.

The bill drawn in New-York upon Philadelphia was presented for acceptance and refused. The notary in Philadelphia neglected to give notice of non-acceptance, by which the drawer and a New-York endorser were discharged. It is in evidence that if notice had been promptly given, the bill would have been paid out of securities belonging to the drawer, in the hands of an endorser, which were given up after waiting a sufficient time for the receipt of notice of non-acceptance. The holder also failed, on the ground of want of notice, in a suit against the same endorser. It is now contended that the notary was not guilty of any negligence or misfeasance in omitting to give notice of the non-acceptance, such notice not being required by the common law, as it is interpreted in Pennsylvania. The evidence of distinguished counsel in Philadelphia, shews that, according to the decisions of that state, protest for non-payment would be sufficient, and neither protest nor notice of non-acceptance was necessary to bind drawer or endorser in Pennsylvania. I cannot consider this objection to the recovery as of any weight. The bill was drawn in New-York, and was a foreign bill in Pennsylvania. Those who undertake to collect foreign paper, are as much bound to inform them-

selves as to what is necessary to protect the holders of such paper, as if it were domestic and governed wholly by their own local law. On the contrary, the law of New-York, so far as regards the New-York parties, must, on the broad principles of commercial and international jurisprudence, from part of the local law itself, if the New-York endorser or drawer should be accidentally sued in the courts of Pennsylvania. If this defence could be sustained, it would be fatal to the most valuable interests of our internal trade and exchanges between state and state. Besides, the law of which the defendants claim that their agent had a right to be ignorant, is a part of the more general commercial law from which the jurisprudence of Pennsylvania differs. That general law which is recognized as governing negotiable paper, is this; "If a bill be in fact presented, though unnecessarily, and acceptance be refused, notice should be immediately given to the persons to whom the holder may resort for payment, or they will be discharged from their respective liabilities. *See Chitty on Bills, last ed.* 354. 2 *Kent's Comm. Lecture* 44, *passim.* Then I borrow the language of Judge Story, strictly applicable to the very case before us, "By the common law, the protest is to be made at the time, in the manner, and by the persons prescribed in the place where the bill is payable. But as to the necessity of making a demand or protest, *the circumstances under which a demand may be required or dispensed with,* these are incidents of the original contract which are governed by the laws of the place where the bill is drawn. They constitute implied conditions upon which the liability of the drawer is to attach according to the *lex loci contractus,* and if the bill is negotiated, the responsibility attaches upon each successive endorser, according to the law of the place of his endorsement, for each endorser is a new drawer." *Story's Conflict of Laws,* § 360. It may be observed here, that this *doctrine* prevails not only in the countries and states under the authority or influence of our common law, but also in France and other countries whose jurisprudence flows from another source. *Pardessus, Droit Commercial,* § 1497, 1499. I mention this fact, not in support of the

Allen v. Merch. Bank of New-York.

authority of the rule, but as showing how universal it is, and that consequently, whoever undertakes in any way to collect or negotiate foreign paper, ought to be acquainted with it, or must take the risk of ignorance or negligence upon himself. If, however, this should be allowed as a good defence for the notary against those to whom he is immediately accountable, it is not so in the mouths of the present defendants. It was their duty to see the steps required by our law, and the general law merchant, taken when they became necessary, and to give instructions to their agent, unless, as is commonly very safely done, they voluntarily chose to leave the business to the discretion of some proper person ; which discretion they must assume as their own.

III. There is yet one other point in this case. This, if I recollect rightly, was not pressed in the argument before us, yet when it was first suggested, it seemed to me of more force than any other in the defence. It is the fact of this negligence having been committed by a notary, a commissioned public officer appointed by the executive authority of the state.

If this *laches* had been committed by that officer in that part of his duty which was peculiarly official, and could only be performed by himself or some other notary, he having been requested or instructed to perform such duty, I doubt whether the collecting bank or any other institution or person employing him, would be responsible for his neglect in that which was not voluntarily confided to him, but wherein his official duties were rendered necessary by the requirements of the law ; and where his employer had done all that was within his power for the performance of the original undertaking. Then it would seem that the notary would alone be responsible. This verdict might therefore stand, though upon other grounds than those upon which it was placed by the judge at trial, or by the supreme court. Further consideration has led me to think that this principle does not apply here. Notaries are commissioned public officers, whose office gives to their notarial attestation, a peculiar authority and effect according to the law of negotia-

ble paper. This attestation it is their duty to grant when directed and required. But they are with us, also in practice, the agents of the several banks in whose *employ* (in the phrase used in evidence here) they may be. As such agents, it appears that business, connected with their official character, yet still not strictly official, is confided to them ; such as sending of notices of non-acceptance or non-payment where no protest is required. To them the evidence shews the banks often send paper, when at maturity, to be presented for acceptance, without specific instructions, confiding wholly to them as their agents to do what may be necessary or expedient in the case. In the present instance the notary's strictly official acts were sufficiently correct. Upon refusal to accept, he noted the bill for protest. This is all that the law required. " The notarial protest is a requisite step in the case of a foreign bill, and must be made promptly on refusal. It is sufficient, however, to note the protest on the day of demand, and it may be drawn up in form at a future period." 2 *Kent's Comm.* 93. *See also Chitty on Bills.* The giving notice of non-acceptance was another and important duty, not necessarily and strictly official, which those who employed the notary thought fit for reasons of convenience to confide to him, but which might have been executed by any clerk. Again : the bill was sent without particular instructions, and left to the notary's discretion. On a similar bill of the same drawer and drawee, two days before, he had instructions to give notice, which was done, and the bill was saved. All this gives to the notary, in my view, the character of an agent, to whose discretion his employers trusted in part, and for whose neglect they should be answerable. But these are not strictly mere conclusions of law. The fact of the relation of this notary at Philadelphia to his bank, the question of the duty and usage of special instruction, the duties of the Philadelphia banks on a bill being returned by their notary merely as noted for protest, all these present mixed questions of law and fact which should have gone to the jury, under the direction of the judge. The misdirection of the judge turn-

ed the attention of the jury wholly to other points, and there-fore (as is said in a recent case,) "Inasmuch as the verdict may have resulted from the error of the judge, a new trial ought to be granted." 9 *Cowen*, 674. Besides, were the probability of a different verdict far less than I think it is, I should still judge a new trial proper. The granting or refus-ing a new trial for misdirection is wholly within the discretion of the court above, to be so applied as to promote the sub-stantial ends of justice. The misdirection here so completely covers the whole ground of the verdict, excluding all other points from the consideration of the jury, and its result has so important a bearing upon commercial usage and under-standing, that it appears to me that the justice of the case and public policy will alike be promoted by a reversal of the judgments of the courts below. The emphatic language of Chief Justice Parsons is peculiarly applicable here. "The law is our criterion of right and wrong, in the decision of causes; and if it be mistaken by the court, whose duty it is to declare the law, the consequence of error may be ex-tensive, reaching far beyond the action in which it was com-mitted, and materially affecting other legal questions." 5 *Mass. R.* 365.

On the question being put, *Shall this judgment be revers-ed?* the members of the court divided as follows :

*In the affirmative:* Senators Fox, Hawkins, Hunt, Hunt-ington, Lee, H. A. Livingston, Maynard, Moseley, Nich-olas, Peck, Skinner, Van Dyck, Verplanck, Wager —14.

*In the negative:* The Chancellor, and *Senators,* Beardsley, Clark, Hull, Hunter, Johnson, Jones, Paige, Spraker, Sterling—10.

Whereupon the judgment of the supreme court was re-versed, a *venire de novo* directed to be awarded, and the costs in this court and in the supreme court ordered to abide the event.

In this case, the court adopted the following resolution : Resolved, that when a bank or broker, or other money dealer, receives upon a good consideration, a note or bill, for collection in the *place* where such bank, broker, or dealer carries on business, or at a *distant place,* the party receiving the same for collection, is liable for the neglect, omission or other misconduct of the bank or agent to whom the note or bill is sent either in the negotiation, collection or paying over the money, by which the money is lost or other injury sustained by the owner of the note or bill, unless there be some agreement to the contrary express or implied.