(103 App. Div. 428.)

AMSINCK et al. v. ROGERS et al.

(Supreme Court, Appellate Division, First Department. April 14, 1905.)

1. FOREIGN BILLS—INDORSEMENT—PRESENTMENT FOR PAYMENT—PROTEST—LIABILITY OF DRAWER—WHAT LAW GOVERNS.

Where a foreign bill of exchange, with bill of lading attached, was indorsed by the drawer to plaintiffs for discount, and by them forwarded to their agents for presentment to the drawees, the drawer's liability on his indorsement, on payment being refused, was governed by the law of the place where the indorsement was made, and not of the foreign country where the bill was presented for payment.

2. SAME—NEGOTIABLE INSTRUMENT LAW—CHARACTER OF PAPER.

Where an instrument for the payment of the price of a shipment of iron was drawn by the seller on the buyer, who resided in a foreign country, and, with the bill of lading attached, was indorsed for discount, it was a foreign bill of exchange, and not a check, under Negotiable Instrument Law, §§ 210, 321 (Laws 1897, pp. 745, 756, c. 612), defining a bill of exchange as an unconditional order in writing, addressed by one person to another, signed by the person giving it, requiring the addressee to pay on demand, or at a fixed or determinable time, a certain sum of money to order or to bearer, and defining a check as a bill of exchange, drawn on a bank, payable on demand.

3. SAME—FAILURE TO PROTEST—DISCHARGE OF DRAWER.

Where a foreign bill of exchange was presented for payment by the agent of the indorsee, and payment was formally demanded and refused, but the bill was not duly protested for nonpayment, the drawer was discharged from liability to the indorsee under the express provisions of Negotiable Instrument Law, § 260 (Laws 1897, p. 750, c. 612).

Appeal from Judgment on Report of Referee.

Action by Gustav Amsinck and another against William C. Rogers and others. From a judgment on referee's report in favor of defendants, plaintiffs appeal. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Charles Oakes, for appellants.
Martin Conboy, for respondents.

INGRAHAM, J. This action was tried before a referee, and the facts found were fully sustained by the evidence. The question presented depends entirely upon the legal conclusion to be drawn from the facts found by the referee. The plaintiffs were copartners, doing a commission and banking business in the city of New York; the defendants were copartners, doing a wholesale iron business in New York and various other cities in the United States. On the 3d of September, 1900, the defendants sold 1,000 tons of iron to a firm of iron merchants doing business in Vienna, in the empire of Austria, at a net purchase price of £2,058 6s. 8d. sterling. In compliance with this contract, the defendants caused to be shipped,

on the 12th of December, 1900, from Birmingham, Ala., 1,000 tons of pig iron, consigned to the defendants at Trieste, Austria, taking from the railroad company an export bill of lading therefor. On December 26, 1900, the railroad company caused the iron to be loaded on a steamship at New Orleans, La., which vessel was expecting to sail forthwith for Trieste, Austria, and received from said steamer a bill of lading, which was by the railroad company forwarded to the defendants in the city of New York. Whereupon the defendants notified the purchasers by cable that the said iron had been shipped on December 26, 1900. On the 8th of January, 1901, the defendants drew an instrument in writing, as follows:

"Exchange for                                      New York, January 8, 1901.
£2058 6/8
   "On demand of this original check (duplicate unpaid), pay to the order of Rogers, Brown & Company, twenty hundred and fifty-eight pounds 6/8, payable at rate for bankers checks on London value received and charge the same to account of pig iron per S. S. 'Quarnero'.          Rogers, Brown & Co.
"To Mess. A. Herm Fraenkl Soehne,
   "Ruepgasse, Vienna, Austria."

Upon this instrument there was indorsed:

"Pay to Messrs. G. Amsinck & Co.
or order Value received.
      Jan. 8, 1901.
(2 one cent U. S. Internal Revenue
stamps, cancelled.)
      "Rogers, Brown & Co."

This instrument, thus indorsed, was delivered by the defendants to the plaintiffs, with the bill of lading covering the iron, which was also indorsed to the plaintiffs and attached to the draft. Upon the delivery of this check or draft to the plaintiffs, the plaintiffs paid to the defendant the equivalent in American money of the amount called for by the draft. The referee found that the plaintiffs purchased the check or bill in due course of business, were bona fide purchasers for value, without knowledge or notice of equities or defenses, if any such existed; that on the 9th of January, 1901, the day after this check or draft was sold, the defendants were advised by cable from the purchasers that, on account of a claim of delay in shipment of said iron, they would not accept the same, except at a reduction of five shillings per ton; that on the same day the defendants consented by cable to this reduction, and advised the purchasers to pay the draft or check, and to draw upon the defendants for the difference of five shillings per ton, amounting to £300 sterling, to cover this difference; that, on the receipt of said cable, the purchasers, on January 10, 1901, drew upon the defendants a draft in the said sum of £300 sterling to cover this difference, which was presented on January 25, 1901, to the defendants in New York, and paid by them in full, and the sum so paid was remitted to and received by the purchasers on or about February 12, 1901; that the steamer upon which this iron was shipped did not sail until January 19, 1901, and arrived at Trieste, Austria, on the 5th of March, 1901; that during the months of January, February, and March, 1901, there was a fair market for pig iron

at Genoa, Italy, where the steamer first stopped, arriving at Genoa
on February 20, 1901; that on the 20th of February, 1901, the said
1,000 tons of pig iron could have been sold by the defendants at
Genoa, Italy, at the same price at which the same had been sold to
the purchasers in Vienna; that upon the arrival of the ship in
Trieste, Austria, the purchasers refused to accept the iron, upon
the ground that the same had not been forwarded and delivered
within the time specified in their agreement with the defendants;
that on January 8, 1901, this check or bill drawn by the defendants
upon the purchasers was forwarded by the plaintiffs to Vienna for
collection, and was received by mail by the collecting agents in
Vienna on the 22d day of January, 1901; that this check or bill was
presented by the agents to the purchasers of the iron at the latter's
address at Vienna on January 22, 1901; that the agent presenting
this check or bill to the purchasers was requested by the purchasers
not to present it at that time, because there were certain differences
then existing between the drawer of the draft and the defendants
concerning the iron in question, which would probably be adjusted
in a short time; that the messenger thereupon withdrew the pre-
sentment; the check or bill was not paid and was not protested,
nor were the defendants notified of the presentment and nonpay-
ment; that on January 28, 1901, the check or bill was again pre-
sented by the agent in Vienna for collection, and payment again
demanded of the purchasers of the iron; that the same request was
again made that the check or bill should not be presented at that
time, for the same reason given on the occasion of the first present-
ment on January 22, 1901, and it was again withdrawn, was not
then paid and was not protested, nor were the defendants notified
of such presentment and nonpayment; that on February 12, 1901,
this check or bill was again presented by the collecting agents;
payment was then formally demanded, which was refused, but no
formal protest was made, and no notice given to the defendants;
that on February 13, 1901, the collecting agents forwarded through
the regular mails a letter to the plaintiffs' agent in London, inclosing
this check or bill, and informing them that the same had been duly
presented on February 12, 1901, and payment had been demanded
and refused; that this letter was received by the plaintiffs' agent
in London on February 12, 1901, and on the same day the plaintiffs'
agent mailed a letter to the plaintiffs in New York, notifying them
that the check had been presented for payment on February 12,
1901, and payment refused; that on February 18, 1901, the plain-
tiffs' London agent received a cable from the plaintiffs in New York
inquiring what had been done concerning the check, and on the
same day the plaintiffs' agent in London cabled to the plaintiffs'
agent in New York stating that the check or bill had been presented
for payment to the drawees, and that payment thereof had been
refused; that on the same day the plaintiffs cabled their agent in
London to have the check or bill protested, and on that day the
plaintiffs' agent in London returned the check or bill by mail to
their Vienna correspondents, instructing them to present it once
more and have the same protested; that it was received in Vienna

by mail on February 21, 1901, and on that day was presented to the drawees, payment demanded and refused, and it was thereupon on the same day protested, and on February 22, 1901, was, with the protest, returned by mail to the plaintiffs' agent in London; this letter was received in London on Monday, February 25, 1901, and was mailed by the plaintiffs' agent in London to the plaintiffs in New York, with the protest, on the first mail leaving England for New York; that this letter, with inclosure, was received by the plaintiffs in New York on March 11, 1901; that on February 18, 1901, when the plaintiffs first received word by cable that the check or bill had been presented and payment refused, the plaintiffs notified the defendants that they had received a cable from London stating that the drawees would not pay the check or bill, owing to differences between the sellers and buyers not yet settled; that this letter was delivered to the defendants at their office in the city of New York by a messenger of the plaintiffs on February 18, 1901; that on February 25, 1901, the plaintiffs received from their London correspondents a letter informing the plaintiffs in detail of the presentment and nonpayment of the check, and on the same day the plaintiffs wrote a letter to the defendants stating the substance of the communication that they had received from their London agents, which letter was received by the defendants on the same day, but no answer appears to have been given by the defendants; that the check or bill, with the certificate of protest, was received by the plaintiffs on March 11, 1901, and on the same day the protest, with a memorandum of the expenses, was sent to the defendants; that in reply to this the defendants wrote to the plaintiffs saying that the unauthorized action of the plaintiffs' Vienna representative "in neither collecting nor protesting the draft in proper time, nor giving any advice concerning it, has placed the entire transaction in such a position that we cannot properly allow any further responsibility to rest upon us in the matter"; that the plaintiffs thereupon demanded of the defendants the repayment of £2,072 7s. 6d. sterling, equivalent to $10,102.83, being the amount of the check, with the protest and other charges, which payment was refused; that the iron was subsequently sold in Scotland, and realized the sum of $5,738.38, which appears to have been received by the plaintiffs, leaving an amount of the draft unpaid of $4,364.45. The referee further found that under the laws of the empire of Austria a demand or sight draft or check, whether foreign or domestic, may be presented for payment as frequently as occasion requires within two years after its date, and each such presentment is legally effective; that such laws do not provide for protest of such check, for nonpayment, or for notice to drawer or indorser; and that no agreement was ever made that the instrument set forth in the amended complaint should not be duly presented and protested in case of nonpayment, and notice of such nonpayment and protest given to the defendants, nor waiving any rights of the defendants in these respects; and that the defendants never waived nor made any agreement to waive the effect of the nonprotest of the instrument set forth in the amended complaint, or that due notice of the

nonpayment thereof had not been given to them; and that the defendants never made any agreement to pay the plaintiffs the amount called for by the instrument set forth in the amended complaint, or any part thereof, notwithstanding the failure to protest the same for nonpayment; and, as a conclusion of law, the referee directed a dismissal of the complaint.

It is claimed by the plaintiffs that the law regulating the protest of instruments of this character and the notice necessary to hold the defendants as the drawer of the instrument was the law of the empire of Austra; while, on the other hand, it is claimed by the defendants that the law regulating the liability of the drawer of the instrument, applicable, was the law of the state of New York. The learned referee held, and we think quite correctly, that the liability of the defendants was to be determined by the law of the state of New York. The sale of this check or draft was made in the city of New York. Upon the completion of that transaction the title of the check or bill vested in plaintiffs. They then became its owner, and, as security therefor, held the title to the iron upon the steamer, the bill of lading of which was indorsed over to the plaintiffs at the time of the delivery of the check or bill to the plaintiffs. The defendants thereafter had no interest in or control over either the check or bill, or the iron which had been shipped and which was represented by the bill of lading. No liability of the defendants to the plaintiffs then existed. The only obligation of the defendants was to the holder of the bill or check if it was dishonored, and the obligation that then arose was an obligation to pay the amount of the bill in the state of New York, where it had been originally negotiated. The obligation of the defendants, therefore, if it arose at all, was to be performed in the state of New York, and is to be governed by the laws of that state. This rule is stated in Am. & Eng. Enc. of Law (2d Ed.) vol. 22, p. 1346. See, also, Carroll v. Upton, 2 Sandf. 171; Allen v. Merchants' Bank of New York, 22 Wend. 215, 34 Am. Dec. 289, and cases there cited.

As to whether or not the defendants were discharged by a failure to protest this instrument for nonpayment depends upon the nature of the instrument—whether it is a check or bill of exchange; but that question is now settled by the negotiable instrument law (chapter 612, p. 719, of the Laws of 1897). Section 321 of that act defines a check as a bill of exchange, drawn on a bank, payable on demand; and section 210 defines a bill of exchange as an unconditional order, in writing, addressed by one person to another, signed by the person giving it, requiring the person to whom it is addressed to pay on demand, or at a fixed or determinable future time, a sum certain in money, to order or to bearer. As the instrument in question was not drawn on a bank, and was not therefore a check, it came within the definition of a bill of exchange contained in section 210 of the act. Section 213, p. 746, of the negotiable instrument law, provides that an inland bill of exchange is a bill which is, or on its face purports to be, both drawn and payable within this state. Any other bill is a foreign bill. Under this section this instrument was a foreign bill of exchange. It is also provided by the negotiable instrument law that a failure to protest this bill upon its dishonor discharged the defendant. Section 260 provides that,

where a foreign bill which has not previously been dishonored by non-acceptance is dishonored by nonpayment, it must be duly protested for nonpayment; that, if it is not so protested, the drawer and indorser are discharged. Section 261 provides how such protest must be made, and section 263 provides that such protest must be made on the day of dishonor.

Upon the undisputed facts in this case, I think the bill was dishonored upon the day when first presented for payment. It called for payment on demand. The bill was presented to the drawee for payment. It was not paid, and was therefore dishonored. If, however, there can be any doubt about the dishonor of the bill when first presented, based upon a withdrawal of the presentment by the agent who had it in charge, there can be no doubt but that the bill was dishonored when it was presented on February 12, 1901, and payment formally demanded and refused; and consequently, under section 260 of the negotiable instrument act, to which attention has been called, the drawers were discharged. If it were necessary to show that this failure to give to the defendants notice of the dishonor of this bill caused damage to the defendants, the evidence clearly establishes that, if the bill had been protested for nonpayment when first presented, the defendants could have protected themselves from loss by selling the iron at Genoa, where the steamer with the iron on board arrived some time after the bill was first presented and dishonored. Under the law of this state, however, there is no question but that the failure to protest the bill discharged the defendants.

It follows that the judgment appealed from must be affirmed, with costs. All concur.