Brinkerhoff, J.
It is conceded on all hands, that under the provisions of the act of February 24,1845, “ to incorporate the State Bank of Ohio, and other banking companies,” on the commission of an act of insolvency by the Commercial Bank of Toledo, the State Bank of Ohio, the defendant in this case, became, by operation of law, the assignee of the Commercial Bank, and, as regards every thing in contest here, substituted to its rights.
The plaintiffs seek, in this action, by a recovery against the State Bank, to obtain a preference over general cred *469 itors of the Commercial Bank. On the other hand, if they fail in this, and are held to be, in fact and in law, but general creditors of the Commercial Bank, they will, under the provisions of the act referred to, be postponed until the claims of certain other classes of creditors are first satisfied.
It seems to us that the plaintiffs in this case have lost none of their rights from the fact — supposing it to be so —that their money has been paid over by the American Exchange Bank to the defendant. If it was the plaintiffs’ money in the hands of the former when paid over to the latter, the fact of that payment does not make it otherwise. Nor does the question whether or not the defendant, at the time it received the money from the American Exchange Bank, had notice of the plaintiffs’ rights, have, as we conceive, any bearing upon the rights of the parties before us. The defendant, when it received the money, did not stand in the situation of a purchaser, or other party capable of acquiring new rights distinct from those of the party from which it received the money. And standing in the relation of an assignee in law simply, whatever rights the plaintiffs had against the American Exchange Bank, they still have against the defendant; and the question of notice has nothing to do with the case. If the plaintiffs, immediately before the money was received by the defendant, could have sustained an action like this against the American Exchange Bank, then they are entitled to their present action, and if not, not.
Our inquiries may be somewhat simplified, therefore, and the case relieved from complication, by supposing the American Exchange Bank to be the defendant here, and the action to have been brought immediately before the payment made by it to the defendant.
In the case supposed, then, would the plaintiffs be entitled to recover against the American Exchange Bank ?
In the prosecution of this inquiry, the leading question is, whose agent was the American Exchange Bank ? Was *470 it the agent of the plaintiffs, or of the Commercial Bank of Toledo alone?
"We are not aware that this question has ever been decided by the court of last resort in this state, and the cases in other states are not uniform. A leading case on the point is Allen v. Merchants’ Bank of New York, 15 Wend. 482. That was an action by the owner of a bill of exchange to recover its amount as damages from the Merchants’ Bank of New York, with which he had deposited it for collection, on account of the negligence of a bank in Philadelphia, where the bill was payable, and to which it had been transmitted by the defendant, in failing to take the requisite measures to charge the drawer and indorsers. It was held by the supreme court of New York, that the Philadelphia bank was the agent of the owner of the bill, and not of the Merchants’ Bank of New York; and that when the latter received the bill for collection, in the absence of any special agreement, no other agreement was implied “ than that it shoidd be forwarded with due diligence to some competent agent, to do what should be necessary in the premises.” The judgment of the supreme court in this case, on appeal, was reversed by the court of errors, which held that the secondary agent was, in the case stated, and in the absence of a special agreement or controlling usage, the agent of the primary agent, and not of the owner of the bill; and that “ a bank receiving for collection a bill drawn here, upon a person residing in another state, is liable for any neglect of duty occurring in its collection, whether arising from the default of its officers here, its correspondents abroad, or of agents employed by such correspondents.” 22 Wend. 215. After-wards, in The Bank of Orleans v. Smith, 8 Hill 560, the supreme court virtually adhered to its former decision, notwithstanding the reversal of its former judgment by the court of errors. In the subsequent case, however, of Montgomery County Bank v. Albany City Bank, 3 Seld. 459, the court of appeals held, that “ where a country bank sends *471 to its corresponding bank at Albany for collection, an indorsed bill of exchange payable in New York, and the latter bank indorses and transmits it to its own corresponding bank in New York for the purpose, the Albany bank alone is answerable for any negligence in presenting the bill by which the indorser fails to be charged;” the court of last resort thus again overruling the doctrine attempted to be maintained by the supreme court. And the case in 3 Seld. was followed and approved by the court of appeals, in Commercial Bank of Pennsylvania v. Union Bank of New York, 1 Kern. 203, in which, “ where the Bank of Wilmington was the owner of a bill of exchange, payable at sight at Troy, and indorsed and transmitted it to the plaintiff under an arrangement by which the latter collected and retained the proceeds of paper thus remitted to it, and with the same redeemed the circulating notes of, and paid drafts drawn by, the bank of Wilmington; and the plaintiff indorsed and transmitted the bill to the defendant, its correspondent in New York, for collection, and the same was by the latter sent to the Troy City Bank for the same purpose;” it was held, “ that the plaintiff could recover of the defendant the amount of the bill if collected by the Troy City Bank, or if the same was lost by the omission of the latter to charge the drawer and indorsers.” And this seems now to be the settled doctrine of the courts of New York. The same doctrine is asserted by Story, J., in Taber v. Perrot, 2 Gall. 565. While the controversy was still pending in the courts of New York, and before the reversal of the judgment of the supreme court by the court of errors, the doctrine of the former court was followed by the courts of Connecticut and Massachusetts, in East Haddam Bank v. Scovil, 12 Conn. 303, and Fabens v. Mercantile Bank, 23 Pick. 330.
Erom the first we have felt the question to be one of much difficulty, and we have given it an unusual share of attention. In the midst of the conflict of authorities, we have been rather bewildered than aided by the adjudica *472 tions in other states, except so far as the discussions resulting from the conflict tend to throw light upon the principles involved in it.
I do not know that the arguments upon the question, pro and con, can he more fairly presented than in the language of Chancellor Walworth and of Senator Verplanck, in the court of errors, in Allen v. The Merchants’ Bank.
The Chancellor says:
“It is a general rule-of law, that hanks and other corporations, as well as individuals, are liable for the acts or omissions of their general officers and servants, in relation to any business entrusted to the corporation or individual to be transacted. Hut this rule does not apply to a case where, from the nature of the business to be performed, it cannot be done by any of the ordinary officers or servants of the corporation or individual, but must be entrusted to a sub-agent employed for that special purpose; or where by the usages of trade it is customary to employ a special agent for the purpose of transacting the business. Here, from the very nature of the business to be transacted, and from the general usage in such cases, it was necessary to employ a bank or other agent in Philadelphia for the special purpose of negotiating this bill of exchange, and of receiving the payment thereof, if it should be duly honored. Prima facie the risk of the neglect of such foreign bank or other special agent to negotiate the bill properly, should be upon the owner of the bill who has impliedly authorized the employment of such special sub-agent. I admit that if it had been the custom of the banks to receive a commission or compensation for the collection of such bills and notes, beyond the difference of exchange between the two places and the actual expenses of negotiation, it might very properly have been considered as in the nature of a del credere commission, so as to render such banks legally liable for the loss which might be occasioned by the negligence or misconduct of their corresponding banks or agents. The incidental benefit which the bank *473 in New York might receive, in having the money collected through that institution, from the chance of its remaining there as a deposit for a short time after it was collected, was undoubtedly a sufficient consideration for an implied agreement on the part of the bank, that the bill should not be lost to the plaintiffs by reason of any negligence on the part of the bank, or of its officers or servants; and such was the decision of this court in the case of The Bank of Utica v. McKinster, 11 Wend. 478. But it certainly would be going very far to say that this mere chance of benefit to the bank was in fact a del credere commission, from which an agreement to warrant the plaintiffs against loss from the mistakes and negligence of the corresponding bank or agent, could legally be inferred. I therefore conclude, that there was nothing in the law or in the facts of this case, which could entitle the plaintiffs to recover against the defendants, on the ground that the bank in New York was answerable for the negligence of the Philadelphia bank or its notary to give notice of the dishonor of the bill, when it was returned to that bank, on the day of its presentment noted for non-acceptance.”
In reply, Senator Verplanck says:
“It is well settled in this state that there is an implied undertaking by a bank or banker receiving negotiable paper deposited for collection, to take the necessary measures to charge the drawer, maker or other proper parties, upon the default or refusal to pay or accept. Smedes v. Bank of Utica, 20 Johns. Rep. 372, and S. C. in this court, 3 Cow. 663; McKinster v. Bank of Utica, 9 Wend. 46; 11 Id. 473, S. C. The ground of this rule is, that the acceptance of negotiable paper thus deposited for collection, forms an implied undertaking to make the demands and give the notices required by law or mercantile usage, for the perfect protection of the holder’s rights against all previous parties; for which undertaking the use of the funds thus temporarily obtained, or of the average balances thereof, for the purposes of discount or exchange, forms a *474 valuable consideration. Had we no express authority on this head, I should consider the acceptance by a bank of paper for collection from a customer, in the usual course of his business, as sufficient evidence of a valuable consideration. The whole ordinary business of a bank with its dealers, is one of mutual profit or accommodation, and must be taken together (unless some part is separated by express understanding), and it is not for a bank to allege or for a court to consider (as the chief justice seems to do), that a collection in a particular place must be regarded as a gratuitous favor. If accepted at all, the general profits and advantages of the business of which this may perhaps be an unproductive part, form a good consideration for the undertaking. * * *
“ "What then is the ordinary undertaking, contract or agreement of a bank with one of its dealers, in the case of an ordinary deposit of a domestic note or bill, payable in the same town received for collection ? It is a contract made with a corporate body having only a legal existence, and governed by directors, who can act only by officers and agents; or if it be with a private banker, he too is known to carry on his business by clerks and agents. The contract itself is to perform certain duties necessary for the collection of the paper and the security of the holder. But neither legal construction nor the common understanding of men of business can regard this contract (unless there be some expi’ess understanding to that effect) as an appointment of the bank as an attorney or personal representative of the owner of the paper, authorized to select other agents for the purpose of collecting the note, and nothing more. There is a wide difference made as well by positive law as by the reason of the thing itself, between a contract or undertaking to do a thing, and the delegation of an agent or attorney to procure the doing the same thing — between a contract for building a house (for example), and the appointment of an overseer or superintendent, authorized and undertaking to act for the *475 principal, in having a house built. The contractor is bound to answer for any negligence or default in the performance of his contract, although such negligence or default be not his own, but that of some sub-contractor, or under workman. Not so the mere representative agent, who discharges his whole duty if he acts with good faith and ordinary diligence in the selection of his materials, the forming his contracts and the choice of his workmen. Now in the case of the deposit for collection of a domestic note or bill payable in the same town, no one can imagine that this, instead of being a contract with the bank to use the proper means for collecting the paper, is a mere delegation of power to act as an attorney for that purpose. If this were so, and it should happen that by the fraud, the carelessness, or the ignorance of a clerk or teller, the only responsible parties were discharged, or the note itself lost or destroyed, it would be a sufficient defense for the bank if it could shew that the directors had employed ordinary care and caution in selecting their officers; or any similar defense which would be good in the mouth of an attorney in fact, or a steward acting in good faith for his principal, who had been defrauded in any transaction. If such were the understanding of this business, and the merchant had to look to the responsibility of the teller or clerk through whose hands his paper may pass, and not to that of the bank which employs them, few deposits for collection would be made, and it would soon be found expedient to deal only with banks or bankers who would guaranty their officers. But the natural and general understanding of men of business is surely not this; it is that of an implied agreement with the bank itself, of whose officers and agents they have no knowledge, and with whom they have no privity of contract.
“ The decisions of our own courts, above cited, call this transaction a contract, and treat it as such. Then the law is clear, that by the employment of under agents or servants, for his own convenience or to perform part of *476 what he has contraced to do, the employer becomes civily responsible to those with whom he contracts or deals in his business. The general principle of Lord Holt has always been cited with approbation, though the correctness of its application to a political office was denied, that £ where a trust is put in one person, and he whose interest is intrusted is damnified by the neglect of such as that person employs in the discharge of that trust, he shall answer to the person damnified.’ 12 Mod. Rep. 490. The same doctrine is thus summed up by Judge Story, from a long succession of authorities: £ It is a general doctrine of law, that the principal is held liable to third persons in a civil suit for the frauds, deceits, misrepresentations, torts, negligences, and other malfeasances or misfeasances and omissions of duty of his agent in the course of his employment, although the principal did not authorize or justify, or indeed know of such misconduct, or even if he forbade them or disapproved of them.’ Story on Agency, ch. 17, sec. 452, and authorities cited in note 3. £ The maxim is,’ says Lord Kenyon, £JRespondeat superior — The principals are responsible for the acts of the servants in those things that respect their duty under them, though not answerable for things that do not respect their duty.’ 8 Term Rep. 531. This rule sums up the doctrine with great force, clearness and precision. Thus the carrier is liable for the negligence of his agent, by which goods committed to his care are damaged. So the ship owner is liable to the shipper for damages caused by reason of the neglect or misconduct of the master or mate. £ This liability,’ says Judge Story, £ extends not only to the injuries and wrongs of the agent immediately employed in a particular business (as in this case to the Merchants’ Bank itself), but also to the injuries and wrongs done by others who are employed by that agent under him, or with whom he contracts for the performance of the business; for the liability reaches through all the stages of the service.’ Story on Agency, sec. 454, and cases there cited in note. It is this *477 distinction, on which I have already insisted as founded in the reason of contracts, between the undertaking to perform any thing, and the mere receiving a delegation of authority to act for another, which reconciles many decisions evidently equally just in themselves, but apparently clashing in words and conflicting in authority. I include among these, in addition to the class of cases already cited or referred to, those in which persons dealing or contracting with an agent or contractor, and trusting to his credit, have endeavored to charge his principal, with whom, however, they themselves had no privity; see, for instance, the two cases in 6 Taunt. 147,148. If it be not a mere representative agency, hut a contract or undertaking to do the business, the original principal is answerable; and for the same reason he is to look to the immediate contractor with himself, and not to the inferior and distant under contractors or agents, for defaults injurious to his own interest. '
“ Such then being the general law, the banak, in undertaking to collect negotiable paper, is answerable for the neglect of its ordinary agents. Is there any thing in the mere fact of the paper being payable in another city, and therefore requiring the aid of other agents, sufficient to take that case out of the general rule ? I mean irrespectively of any agreement or implied understanding as to the matter. The chief justice, in delivering the opinion of the supreme court, holds that there is, and says: £ A note or bill left at a bank, and"received for the purpose of being sent to some distant place for collection, would seem to imply, upon a reasonable construction, no other agreement than that it should be forwarded with due diligence to some competent agent, to do what should he necessary in the premises. The language and acts of the parties fairly import so much, but nothing beyond it. The person leaving the note is aware that the bank cannot personally attend to the collection, and that it must therefore be sent to some distant or foreign agent.’ This seems to me to assume the very question in dispute. In a deposit of a *478 note for collection, payable in tbe same place, tbe holder is equally aware tbat tbe bank cannot personally attend to tbe collection, and its management must be left to some one or more competent agents. But be makes an implied contract with tbe bank tbat tbe proper and expedient means shall be used to collect bis note. So be does as to a foreign debt; and in each case be alike presumes tbat proper agents will be employed. In neither case has be any knowledge of tbe agents, or privity with them. I can perceive no reason for liability or exemption from liability in either case which does not equally apply to tbe other. Tbe bank, if its officers think fit, and tbe dealer will consent, may vary tbat liability in either case. It may receive tbe paper only for transmission to its correspondents. Tbat would form a new and different contract, and would limit tbe responsibility to good faith and due discretion in tbe choice of an agent. But if this be not done, or unless there be some implied understanding on tbe subject, I see no difference between tbe responsibility assumed in tbe undertaking to collect foreign bills, and tbat for collecting domestic paper, payable at home. It is assumed in tbe same manner, in tbe same words, and on tbe same consideration. If tbe reasoning of tbe supreme court be correct, I cannot perceive bow, either in tbe case of domestic collection, or in any other case, tbe principal is to be made liable for tbe default of bis own agent, if, from tbe nature of tbe business, it was evident tbat some under agent must be employed, and tbat tbe principal could not do tbe business without aid. On this principle, tbe ship owner would not be answerable for tbe negligence of the captain, whom all tbe world knows be must employ. Tbe master mechanic, who must (as those who contract with him are well aware) employ sub-contractors, journeymen and laborers, would no longer be liable for their negligence in tbe work be contracts to have executed. The same reasoning which would here make tbe New York bank merely an agent £ to select other agents abroad for tbe party to become bis *479 agents in the collection,’ would equally make the ship owner and the contracting builder mere agents to select masters, mates, journeymen and laborers for those with whom they deal. If it be ‘ unreasonable ’ to suppose, as the chief justice holds, that the bank assumed ‘ to become responsible for the fidelity of agents abroad,’ who 1 all parties knew must intervene before collection,’ and when the plaintiffs ‘ knew that others must be trusted,’ it must be quite as unreasonable in the case of domestic collections, and of all other transactions, where the parties know that { agents must intervene and others be trusted.’ But in all these cases, the parties are not governed by the mere rule of personal representative agency, but are subject to the responsibilities imposed by the law of commercial contracts, of bailment or of shipping. In all these cases, we are not to look to the necessity of the employment of distant or under agents. "We are to look to the contract itself. Legem enim contractus dot. We are to look whether the contract be only for the immediate services of the agent, and his acting faithfully as the representative of his principal, doing for him, in the business confided to his care, what the principal is not able or willing to do for himself, or whether the contract looks mainly to the thing itself to be done, and the undertaking be for the due use ■of all the proper means for its performance. In the one case, the responsibility ceases with the limits of the personal services undertaken; in the other, it extends to cover all the necessary and proper means for the accomplishment of the object, by whomsoever used or employed.
“ Again: it is not true, in the usual and well known course of trade, that there is no other agreement implied than that deposited paper payable abroad shall be forwarded with due diligence, or, as Judge Oakley charged, that ‘ the banks are only bound to transmit such paper in due form and in due time.’ ■ By the known ordinary usage of business, unless, when altered by some special agreement or usage, the banks undertake something more than *480 this. This the holders of paper could do for themselves. But the banks also undertake to receive and pay the funds here, when collected elsewhere. The foreign bank does not know the owner of the bill so as to open an account with him, and to authorize him to draw upon his funds when collected. They know only the bank from which the paper was received, and that bank has at least undertaken to manage the business of exchange between the places; on what ground then is the bank receiving for collection, to be answerable only for the first and last stages of the transaction, and to be discharged from any liability as to all intermediate steps ? ”
In controverting the idea of the chancellor, that a bank, in making collections for a customer, renders a gratuitous service, it seems to me that the learned senator’s statements are hardly as strong as the facts will justify, especially in reference to collections made by banks in the west of bills payable in the east. Such collections, being a means of acquiring eastern exchange, which is always in demand at a premium, although ostensibly gratuitous, is so far from being gratuitous in fact, that it constitutes a lucrative branch of the business of banking, and is so desirable that the allowance of a small premium for the privilege of making such collections is not unusual.
There is another matter not unworthy of notice. Balances on the books of a solvent bank in New York in favor of a western bank are equivalent to deposits in such eastern bank; and these, by the provisions of the fifty-fifth section of the act “ to incorporate the State Bank of Ohio,” etc., (Swan’s Stat. 97,) are made equivalent to specie in them own vaults as a basis of the circulation of the branches of the state bank, of which the Commercial Bank of Toledo was one.
The doctrine of the New York court of errors seems also to have been distinctly held and settled by the British House of Lords, in Mackasy v. Ramsays, 9 Cl. and Pin. 818, 850, cited in Broom’s Legal Maxims, 645. In that *481 case, “M. employed R. & Co., bankers in Edinburgh, to obtain for him payment of a bill drawn on a person resident at Calcutta. R. & Co. accepted the employment and wrote, promising to credit M. with the money when received. R. & Co. transmitted the bill, in the usual course of business,- to C. & Co., of London, and by them it was forwarded to India, where it was duly paid. R. & Co. wrote to M. announcing the fact of its payment, but never actually credited him in their books with the amount. The house in India having failed, it was held that R. & Co. were the agents of M. to obtain payment of the bill; that payment having been actually made, they became ipso facto liable to him for the amount received, and that he could not be called on to suffer any loss occasioned by the conduct of the sub-agents, as between whom and himself no privity existed. “ To solve the question in this case,” said Lord Cottenham, “it is not necessary to go deeper than to refer to the maxim, ‘ quifacit per aliumfacit per se.’ R. & Co. agreed, for a consideration, to apply for payment of the bill; they necessarily employed agents for that purpose, who received the amount; their receipt was, in law, a receipt by them, and subjected them to all the consequences. The appellant, with whom they so agreed, cannot have anything to do with those whom they so employed, or with the state of the account between different parties engaged in this agency.”
On the whole, looking at the question in the light of principle, and of what seems to us to be a sound legal policy, we prefer to adopt the doctrine of the courts of England and New York, as now established.
"We hold, then, that the American Exchange Bank was the agent of the Commercial Bank of Toledo, and not the sub-agent of the plaintiffs. And it follows that the payment of the bill to the American Exchange Bank, and the entry of its proceeds on the books of that bank to the credit of the Commercial Bank of Toledo — the Commercial Bank of Toledo being at the time apparently a solvent *482 institution, and the American Exchange Bank having no notice but that the bill and its proceeds were the absolute property of the Commercial Bank of Toledo — was a payment to the Commercial Bank of Toledo. Erom the moment of such payment, the Commercial Bank of Toledo became the debtor of the owners of the bill, and they might, eo instanti, have maintained an action against it for the amount of its proceeds.
The agreed statement of facts shows that subsequent to this payment of the bill to the American Exchange Bank, and prior to the bankruptcy of the Commercial Bank of Toledo, large mutual dealings, amounting to more than twenty fold the amount of this bill, occurred between these banks; and that thus the proceeds of this bill became, on the books and in the vaults of the American Exchange Bank, inextricably and indistinguishably mingled in the general accounts and general assets of the Commercial Bank of Toledo. In this state of things, the application of the rule as stated in Parsons’ Mercantile Law 802, seems to be inevitable, that “what a bankrupt holds in the right of another, does not pass to the assignee. If, therefore, the bankrupt has collected a debt for another, and has kept the sum so collected apart, it belongs, generally speaking, to him for whom it was collected. But if it is merged indistinguishably into the general assets of the bankrupt, the owner has only a claim for it to be proved like other debts. So, if the bankrupt sold goods for his principal, and they are not paid for, the principal can collect the debt, and sue in his own name. Or, if the bankrupt has received payment for the goods, and has kept that payment apart, the owner, generally, could reclaim it; but not if it were merged in, and mingled with, his assets.”
If the foregoing views be correct, there was, as between the plaintiffs and the American Exchange Bank, no privity in virtue of which the plaintiffs could, on the state of facts existing between them, at any time have maintained an *483 action against it. And moreovei’, whatever balances existed on the books of that bank in favor of the Commercial Bank of Toledo, the agent of the plaintiffs, were indistinguishably mingled with the general assets of the latter; and the plaintiffs could have had no claims against it at all distinguishable from those of a general creditor of the Commercial Bank of Toledo. It can hardly be said that the proceeds of the plaintiffs’ bill were paid over by the American Exchange Bank to the defendant; the most that can be said, is that the proceeds of the plaintiffs’ bill formed a somewhat remote and inconsiderable element in a general account between the Commercial Bank of Toledo and the American Exchange Bank, an undistinguishable portion of a balance of which general account was, after a course of subsequent dealings between the said banks, paid over to the defendant. And, under the circumstances of the case, we think the American Exchange Bank had a right to make the payment, and the defendant had a right to receive it.
There is a class of cases which, at first blush, seem to run counter to the conclusions at which we have arrived, but which, on closer inspection, will be seen to be clearly distinguishable in principle from the case before us, and in no way inconsistent with our conclusions upon it. I refer to such cases as Lawrence v. Stonington Bank, 6 Conn. 521; Bank of Metropolis v. New England Bank, 1 How. 234; Gordon v. Kearney, 17 Ohio Rep. 572; and Wilson Co. v. Smith, 3 How. 763.
These were all cases in which suits were brought by the owners of bills or notes deposited with banks or bankers for collection, against a secondary agent to whom they had been ti-ansmitted by the primary agent; and in all of them the plaintiffs were held entitled to recover, subject, however, in some of the cases, to the right of the secondary agent to retain for a general balance existing in his favor against the primary agent. But all these cases are distin *484 guishable from that under consideration, in the following important particulars:
1. That the secondary agent had notice, before the payment of the bill or note to Mm, of the bankruptcy of the primary agent, and that the bill or note was the property of the plaintiff.
2. That no dealings occurred between the primary and secondary agent subsequently to the payment of the bill or note to the secondary agent.
These cases seem to establish the doctrine, that on the insolvency of the primary agent, and before payment to the secondary agent, and, of course, before any undistinguishable commingling of assets occurs, the principal may, by notice, make the secondary agent his own; and thus, except as to the right of the secondary agent in certain cases to retain as aforesaid, to render the receipt of the proceeds of the bills or notes by the secondary agent, in any other character than that of immediate agent for the principal, wrongful as against the principal, and so to entitle him to recover. This doctrine we have neither disposition nor occasion to controvert, for it has no application to the case before us.

Judgment for defendant.

Swan, C. J., and Scott and Peck, JJ., concurred.