CHARLES SIMPSON v. EBENEZER I. WALDBY AND FRANK W. CLAY.

63  439
d 120  169

*Banks and banking—Collection of draft by correspondent—Liability of home bank—Evidence.*

1. In a suit brought to recover a balance claimed to be due on account of drafts delivered to a bank for collection, the defendant was permitted to show the non-payment, protest, and return of the New York drafts drawn and forwarded by the correspondent making the collection, without producing the same, or satisfactorily accounting for their absence, against the objection of plaintiff that the drafts were the best evidence.

    *Held,* that the objection was well taken.

2. Where, in the ordinary course of business dealing, a draft is intrusted by the drawer to a bank for collection, drawn on a person residing at a distance, and is forwarded by the bank to a correspondent of its own selection for collection, to whom the money is paid by the drawee, but through the failure or dishonesty of the correspondent is not paid to the home bank,—

    *Held,* that, in the absence of any agreement in regard to the matter between the owner of the draft and home bank, it is liable

to him for such loss. [See opinion, pp. 447–450 for a review of conflicting authorities.]

3. As long as banks and bankers hold themselves out to collect bills or drafts for a compensation, they should be governed by the same rules of law applicable to other persons, and, if they desire to avoid such responsibility, they should *limit* their duties and liabilities by *special* agreement, and, failing to do so, must be held responsible, like other business men, for the misconduct of their selected agents at home or abroad.

4. The statements of a book-keeper in a bank, made to a customer who had left a draft for collection, regarding its payment, are admissible in a suit brought by the customer for the money, as admissions made in the course of his duties and agency, and as constituting part of the *res gestæ*. *Morse v. Connecticut River R. R. Co.*, 6 Gray, 450; *Lane v. Boston & A. R. R. Co.*, 112 Mass. 455.

Error to Lenawee. (Howell, J.) Argued July 9, 1886. Decided November 4, 1886.

Assumpsit. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Westerman & Westerman*, for appellant.

*Bean & Lane*, for defendants.

[The opinion discusses so fully the main point decided, citing the conflicting authorities, that a summary of the briefs of counsel is omitted.—REPORTER.]

MORSE, J. The plaintiff brought suit in justice's court to recover a balance claimed to be due him on account of five drafts, of $100 each, drawn by him upon O. S. Rixford, of East Highgate, Vermont. These drafts were made payable to the order of Waldby & Clay, the defendants, bankers at Adrian, Michigan, who undertook the collection of the same.

The drafts were dated, and paid by Rixford, as appears upon their face, respectively, as follows:

March 1, 1884, paid March 14, 1884.
March 10, 1884, paid March 22, 1884.
March 18, 1884, paid March 22, 1884.
March 26, 1884, paid April 3, 1884.
March 31, 1884, paid April 3, 1884.

These drafts were forwarded by Waldby & Clay to the First National Bank of St. Albans, and that bank, after collecting of Rixford, sent its own draft on New York for the money to Waldby & Clay.

Quite a large number of drafts had been drawn by Simpson upon Rixford before this, and collected in this manner without any trouble. Waldby & Clay, upon receipt of the New York draft of the St. Albans Bank, would credit the amount of the same to Simpson, who drew against such credit as he wanted money in his business. Waldby & Clay would forward the New York drafts to their banking-house in New York, which would collect the same, and give them credit therefor.

The defendants claimed that the amount of the last three drafts was never received by them, as, on account of the failure of the St. Albans Bank, a draft or drafts of that bank upon New York, received by them, was protested and not paid in New York, the amount being $300, and filed a notice of set-off with their plea for moneys overdrawn by Simpson.

The trial in justice's court resulted in a verdict and judgment for defendants for $51.62 damages.

On appeal to the circuit court the verdict of the jury was, "No cause of action," and judgment was entered for defendants.

The plaintiff, upon the trial in the circuit, testified that he was dealing in axes manufactured by Rixford, and, by arrangement with him, was authorized to draw upon him for money as he needed it in his business; that, when he made the first draft in the commencement with Waldby & Clay, Mr. Clay asked him where East Highgate was, and he told

him it was a small town in the northern part of Vermont, and that St. Albans was Rixford's banking town; that Clay himself chose the First National as the bank at St. Albans through which defendants would make the collection; that he (Simpson) did not know anything about banks there, and had nothing to do with the selection, nor was there any agreement between him and defendants that the collection should be at his risk. Shortly after, Clay informed him that the draft was paid, and he commenced drawing against it. The last four drafts mentioned in plaintiff's bill of particulars were not paid promptly, as Simpson supposed. After the draft of March 10 he went into Waldby & Clay's for the money. They told him the draft had not been paid. He then drew the one of March 18. He kept calling for money, and receiving the same reply, until he had drawn all the drafts, and still no returns. He had considerable talk with defendants about the matter, and finally said to them that he knew Rixford was all right, and he should write to him, and find out about the matter. He did write to Rixford, and about the time, after so writing, that it would take a letter to reach East Highgate and an answer to return to him, Mr. Waldby called him into the bank, and said:

"Mr. Simpson, the drafts have come. It was just as you stated,—they were delayed in sending them on."

That day, the seventh of April, he drew from Waldby & Clay $150 against the drafts, and April 10 they paid a Wisconsin draft against him, without his knowledge, for $35.15.

He claims that, when they paid him the last $50 of the $150, in the afternoon, they informed him that the St. Albans Bank had failed, but paid him the money just as readily as they ever had upon the receipt of drafts before that date. Soon after, the defendants refused to pay him any more money, and claimed that he must bear the loss of the three drafts, which they said had been protested in New York.

The defendants testified that, when Simpson commenced doing business with them in this way, they had an agreement with him that the collection of these drafts should be at his risk, and that they were not to be responsible for any money collected by the St. Albans Bank until it was paid to them, or until the drafts that might be sent by that bank had been paid or placed to their credit in the bank where they did business in New York, and that the deposit-book which they handed him contained the following, in pursuance of such agreement:

"Obligations payable elsewhere than at our bank are received by us subject direct, incidental, and resultant to the party placing the same with us. We do not undertake to be responsible for the laches or acts of agents to whom we send matter for collection. We will simply act in good faith, and endeavor to use diligence and care."

That they made the credit upon their books to Simpson when they received the St. Albans Bank drafts upon New York for convenience, but not for an absolute credit unless such drafts were paid in New York; admitted that they permitted Simpson to draw at once against such credit, but claimed that it was done because of his importunity.

The plaintiff swears that he never saw the slip pasted in his deposit or pass book until it was shown to him by one of the defendants after they refused to pay him on account of the drafts claimed by them to have been protested.

There is something quite unsatisfactory in the defendants' evidence, unless it is the fault of the record before us.

They do not claim that more than $300 of these drafts were lost by protest and non-payment, but it appears that Rixford paid the drafts of March 10 and 18 at the same date, March 22, and the drafts of March 26 and March 31 at the same date, April 3. How, by the transmission of this money from the St. Albans Bank, they should get $100 and lose $300 it is not plain to understand.

It would seem that it would have been natural and usual

for the St. Albans Bank to have remitted the payment of
March 22 in one draft of $200, and it is not clear how they
should happen to receive $100 of that payment and lose the
other $100 because of the failure of the St. Albans Bank.

The defendants did not produce the protested drafts in
court, which ought to have been in their possession, if unpaid,
or where they could obtain them. Neither can we ascertain
how the money was sent from St. Albans, in how many
drafts, or in what amounts, or when such drafts were pro-
tested in New York.

The draft of March 10 was credited to Simpson upon the
bank-books of the defendants April 7, as was also the one of
March 18, and March 26 and 31 were credited April 9; but
in what shape the returns came from St. Albans cannot be
ascertained from the record. It appears that the drafts
claimed to be protested were two, one for $199 and some
cents, and one for $99 and some cents.

The defendants could not give the date of protest, but they
charged the amount of the drafts back to Simpson May 29,
1884, and one of them testifies that they must have been pro-
tested about that day. They claim that they forwarded the
St. Albans drafts to their banker at New York at once upon
their receipt. If they did, there was nearly two months'
delay somewhere in the matter of protest. We are not in-
formed, either, when the St. Albans Bank failed.

The court erred in permitting the defense to show the pro-
test, non-payment, and return of these St. Albans drafts to
them without first producing the drafts, or satisfactorily ac-
counting for their absence. The objection to this testimony
was not as clearly raised as it might have been, but in the
testimony of Frank W. Clay the objection was made to his
giving evidence that they had received no pay on three of
these drafts, and also to his stating that the drafts were re-
turned to them, which objection the court overruled. The
last objection was based upon the ground that the drafts
were the best evidence.

The court was requested to charge the jury that the defense had not proven a bank failure, or protests of the drafts in question, and that it appeared and was not denied that Rixford had paid the drafts to the order of Waldby & Clay, who gave credit to plaintiff therefor, and permitted him to draw against the credit, as funds in their bank; that they could not, therefore, say they did not have the money, and the plaintiff must recover.

We are not disposed to say that the plaintiff was entitled to this instruction, as worded, because the mere fact of giving credit, and allowing Simpson to draw against the credit, would not preclude the defendants from showing the arrangement to be that the credit was not to be absolute until the final payment of the St. Albans drafts in New York.

We think, however, that when the plaintiff proved the payment of his draft by Rixford, and the receipt of a draft from the St. Albans bank for the same by the defendants, it then devolved upon them to show that through no fault or want of diligence on their part the draft was not paid. This they completely failed to do by any competent or legal evidence in this case. Therefore the verdict should have been for the plaintiff.

But, as the main question argued before us will, of necessity, arise again upon another trial, we shall endeavor to dispose of it.

The counsel for plaintiff requested the court to instruct the jury that—

"If Waldby & Clay, on their own responsibility, received drafts from the St. Albans Bank in payment for the money paid by Mr. Rixford to the St. Albans Bank for Simpson, and, on receiving the same, placed it as money to Mr. Simpson's credit on their books, then the bank would be liable to Mr. Simpson for the amount he claims."

The court refused to so charge, and upon this point instructed the jury as follows:

"And further, gentlemen, if there was no understanding and no agreement as to who should be responsible for loss in the collection of these Rixford drafts, yet, if there was an understanding between Mr. Simpson and Waldby & Clay that these drafts were to be sent to the St. Albans Bank for collection, and Mr. Simpson requested these drafts to be sent to the St. Albans First National Bank for collection, from Mr. Rixford, then, if Waldby & Clay, in pursuance of that request, sent these drafts to that bank, they would not be liable for any money collected, by the St. Albans Bank, of Mr. Rixford, and lost by reason of the failure of the bank, without any fault of Messrs. Waldby & Clay, and Waldby & Clay would not, under such circumstances, be liable to Mr. Simpson in this suit for the amount of the St. Albans draft received by them, unless that draft has been paid to them on their credit, or unless they have agreed with Mr. Simpson to receive it as so much cash belonging to him, and to take upon themselves the risk of its loss by the failure of the St. Albans Bank to pay it to them.

" If, gentlemen, however, you find that Waldby & Clay have in their hands money which they have actually received over and above the amount which they have paid to Mr. Simpson, Mr. Simpson is entitled to a judgment for that amount.

" If you find that by special agreement between Waldby & Clay and Mr. Simpson, or by their usual manner of doing business with him, they received and accepted these St. Albans Bank drafts as so much money belonging to Mr. Simpson, and that they were to be taken at their own risk as to whether the St. Albans Bank ever paid them or not, then Waldby & Clay would hold the balance unpaid on that draft, and Mr. Simpson would be entitled to recover for it; otherwise not."

It is claimed by plaintiff's counsel that the circuit judge erred in stating, as first above, that the bank would not be liable in the absence of any understanding as to the responsibility for loss.

From a careful perusal of the entire charge it does not appear that the jury were instructed upon the precise theory of the plaintiff's claim. He claims that he had nothing to do with the selection of the St. Albans Bank as a medium through which to collect the drafts upon Rixford; that such

bank was chosen by the defendants, and was their agent, not his; and it was contended, under his evidence of the transaction, that the defendants were responsible for the loss of the money occasioned by the failure of the St. Albans Bank.

It will be seen that the circuit judge charged the jury what the law would be, in the absence of any agreement, if Simpson requested the drafts to be sent to the St. Albans Bank, but is silent as to what would be the result if the defendants themselves selected this bank, without any agreement as to who should bear the loss, if any.

The counsel for defendants contend here, as they did below, that in the case of collections, like this, where there is no special agreement, the home bank is only responsible for the use of ordinary care and prudence in the selection of the agencies through which it attempts the collection. This is undoubtedly the purport and meaning of the instructions of the court below, taken as a whole, to the jury.

The question is therefore directly before us, what is the law of the case when a person steps into a bank, in the ordinary course of business dealing, and intrusts to it the collection of a draft drawn upon some person residing at a distance, in case the home bank, through the failure or dishonesty of another bank, selected by itself, never receives the money upon such draft, though the same is paid by the drawee?

In the absence of any agreement in regard to the matter, who must bear the loss, in case the home bank has not been at fault in the selection of its agent or agents?

There is a conflict of authority upon this proposition; and, as it has never been settled in this State, we must be guided and governed in our action by what seems to us the most correct view in justice and on principle.

It is held in New York, Indiana, Ohio, and New Jersey that the home bank must be the loser, upon the principle that such bank undertakes the collection of the draft or bill, and selects its agent or agents, and must be responsible for

their default or neglect, as it would be for the default or neglect of its officers or clerks in the collection of a home bill, or as a contractor would be bound to answer for any negligence or default of his subcontractors or workmen in the performance of his contract. *Allen v. Merchants' Bank of New York*, 22 Wend. 215; *Reeves v. State Bank of Ohio*, 8 Ohio St. 465; *Titus v. Mechanics' Nat. Bank*, 35 N. J. Law, 588; *Ayrault v. Pacific Bank*, 47 N. Y. 570; *Abbott v. Smith*, 4 Ind. 452; *Tyson v. State Bank*, 6 Blackf. 225.

In other states it is adjudged that the customer depositing the draft for collection must be presumed to know, and contract upon the knowledge, that in the ordinary course of business the home bank must employ correspondents or agents abroad to make the collection and transmit the money collected. The holder or maker of the draft, having full notice of the usual course of business, must be held to assent thereto.

"He therefore authorizes the bank with which he deals to do the work of collection through another bank." "The bank receiving the paper becomes an agent of the depositor, with authority to employ another bank to collect it. The second bank becomes the subagent of the customer of the first, for the reason that the customer authorizes the employment of such agent to make the collection."

If, therefore, there is no want of ordinary care and prudence in the selection of the subagent, and no negligence or fault on the part of the home bank, the customer must be the loser for the default or negligence of such subagent, who is regarded as his agent. *Guelich v. National St. Bank of Burlington*, 56 Iowa, 434; *Dorchester & Milton Bank v. New England Bank*, 1 Cush. 177; *East Haddam Bank v. Scovil*, 12 Conn. 303; *Hyde v. Planters' Bank*, 17 La. 560; *Ætna Ins. Co. v. Alton City Bank*, 25 Ill. 243; *Stacy v. Dane County Bank*, 12 Wis. 629; *Bowling v. Arthur*, 34 Miss. 41; *Citizens' Bank v. Howell*, 8 Md. 530; *Bank of Washington v. Triplett*, 1 Pet. 25; *Daly v. Butchers' &*

*Drovers' Bank,* 56 Mo. 94; *Jackson v. Union Bank,* 6 Har. & J. 146; *Bank of Louisville v. First Nat. Bank of Knoxville,* 8 Baxt. 101; Morse, Banking (2d ed.), 408-417.

Nearly all the cases cited above, in support of both sides of the question, relate to transactions by which the draft or bill failed of collection by neglect of the notary to make demand in time, or proper protest, or default of the agent in not moving quick enough to make the money.

In the case at bar the draft was collected of the drawee, and the loss of the money resulted from the failure of the St. Albans Bank, before the collection of its draft transmitting such money to defendants. If defendants were negligent or in fault in not immediately forwarding such draft to New York, upon its reception by them, or in its presentation there, they are, in my opinion, liable to plaintiff for the money; but, if there was no negligence in either of these respects, the question arises, who must bear the loss on account of the inability of the St. Albans Bank to meet its draft transmitting the money?

In *Reeves v. State Bank of Ohio, supra,* it is held that when a bank in Ohio received for collection a draft payable in New York, and for that purpose forwarded the same to its correspondent in New York, such Ohio bank was responsible to the owner of the draft for the conduct of such correspondent, and for the proceeds of the draft immediately upon its collection by such correspondent; that such correspondent was the agent of the Ohio bank, and not the subagent of the owner of the draft, and payment to the agent was payment to the bank, unless there was some agreement or authority between the owner and the bank beyond the mere fact of the draft being received for collection.

In *Mackersy v. Ramsays* (in the house of lords), 9 Clark & F. 818, the same doctrine is maintained. Mackersy employed bankers in Edinburgh to obtain for him payment of

a bill drawn upon a person in Calcutta. The bankers accepted the employment, and wrote him, promising to credit him with the money when received. They transmitted the bill, in the usual course of business, to bankers in London, and by them it was forwarded to India, where it was duly paid. The bank in India that collected the money failed, and the Edinburgh bankers did not receive it. They, however, wrote to the drawer of the bill, announcing the fact of its payment, but never actually credited him with the amount thereof on their books. Held, that the Edinburgh bankers were the agents of the drawer to obtain payment of the bill; that, payment having been actually made, they became *ipso facto* liable to him for the amount received, and that he could not be called upon to suffer any loss occasioned by the conduct of their subagents, between whom and himself there existed no privity.

In 56 Iowa, *supra,* an attempt is made to distinguish this case, on the ground that the decision was based upon the fact that the Edinburgh bank expressly undertook to forward the paper, and upon its payment to place the amount thereof to the credit of the depositor, and for the performance of its undertaking it was to receive a commission, and that, upon such a contract, the bank would be bound to give him credit when it was paid to its correspondent, and therefore became directly liable to the customer.

But the commission charged was only the usual one among bankers, and banks generally have a commission on collections; in the case at bar it being 35 cents on each $100, which was divided between defendants and the St. Albans Bank.

Besides, the opinions, both of Lord Campbell and Lord Cottenham, delivered in the house of lords, were placed upon the broad ground that the Edinburgh bank was liable for the conduct of the bank in India, the same as it would have been for the default or neglect of one of its own officers or clerks in the collection of a home bill, and that its correspondents

were its agents, and not the agents of the drawer of the bill, who had no privity with such correspondents; and that the correspondence between the Edinburgh bankers and such drawer, if it proved any special contract, established only such an agreement as the law would have inferred from the dealings between the parties

The ruling in that case squarely covers the point in issue here, and to my mind is the better doctrine, and most in accord with principle.

The learned jurists holding otherwise all admit that, if a person intrusts a home draft or bill to a bank for collection, such bank is responsible to the customer for any negligence or default of its agents, officers, or employes. I cannot see why any different rule should prevail in the collection of a foreign bill. It is in every case that I have examined sought to be maintained upon the theory that the customer knows the bank must act through some other person or persons at a distance, and therefore, impliedly, from the very nature of the course of business, assents to the employment of such persons, and makes them his agents. This reasoning does not strike me as sound. If I leave an indorsed note against persons in my own town for collection, and consequent demand and protest, I know that some agent or employe of the bank will do the work, or some part of it, and I do not know or inquire who will do it. I contract, however, with the bank that suitable agents will be employed, and hold it responsible for their acts. The law authorizes me to do this.

If I intrust the same bank with the collection of a foreign draft, I also know that they will employ some agent or correspondent abroad, of their selection, not mine, of whom I know nothing, and with whom they are supposed to have business relations. I do not inquire whom they are to select. I presume, and have a right to presume, that they have business knowledge of such agent or agents, which I do not and cannot possess, by the very course of their dealings as bankers.

In each case the bank holds itself out, for a consideration, to collect my paper, and it can make no difference whether the compensation is great or small. In each case it selects its own agents in the premises. In each case I have no part in or control over such selection. In each case there is no privity between the party selected and myself.

I fail to perceive why, in the one case more than the other, I adopt the immediate party collecting or protesting the bill as my agent.

I cannot find any good reason for making this particular case of the collection of a foreign bill an exception to the general rule of agency.

The law in general—

" Is clear that, by the employment of under agents or servants for his own convenience, or to perform part of what he has contracted to do, the employer becomes civilly responsible to those with whom he contracts or deals in his business."

Judge Story, in his work on Agency, announces the doctrine thus:

" It is a general doctrine of law that the principal is held liable to third persons, in a civil suit, for the frauds, deceits, misrepresentations, torts, negligences, and other malfeasances or misfeasances, or omissions of duty of his agent in the course of his employment, although the principal did not authorize or justify, or, indeed, know of, such misconduct."

In no other case that I can recall is a person presumed, by implication of law, without any agreement to do so, to adopt the subagent of a person with whom he deals as his own. The carrier is responsible for the negligence of his agents and employes, as is also the ship-owner and the contractor. Why this distinction in a case of a banker or bankers? If in their case, why should it not also be made in the case of collecting agents and attorneys? But collecting agents and attorneys have been held to the general rule. *Pollard v. Rowland*, 2 Blackf. 22; *Hoover v. Wise*, 91 U. S. 308; *Bradstreet v. Everson*, 72 Penn. St. 124; *Lewis v. Peck*, 10 Ala. 142.

It has been said by some of the courts that the holding of banks liable for the default and neglect of their correspondents in a case like the present would render the collection of bills and drafts of this nature extremely difficult, and that it would tend very much to destroy the facilities which at present exist, and subject the holders of bills to inconvenience and expense, and probably, in many cases, to serious loss.

But as long as banks and bankers or other persons hold themselves out to collect such bills or drafts for a compensation, or their advantage, they ought to be governed by the same rules of law that apply to other persons, and, if they wish to avoid such responsibility, it is very easy for them to accept such business only upon a special agreement as to their duties and liabilities. Failing to do this, I think they must, in taking such bills or drafts, be responsible, as other business men are, for the misconduct of their selected agents at home or abroad.

In this case it may be remarked that the crediting of these drafts, from the very beginning of the business, to the plaintiff, when the New York draft of the St. Albans Bank was received by them, and the payment, at the last, of the Wisconsin draft against plaintiff, after it would appear that they knew the St. Albans Bank had failed, is strong presumptive evidence, not conclusive, however, and open to explanation, that they understood their liability to plaintiff to commence when Rixford paid the drafts.

One other assigned error only needs to be mentioned. Rial Clay, a son of one of the defendants, was employed by them in the bank as book-keeper, and gave testimony in their behalf. His attention was not called to any statement that he made to plaintiff; but on the main case, before he was sworn, and also in rebuttal, plaintiff undertook to testify to something he (Rial Clay) said about the drafts being paid before plaintiff drew the $150, and while he was calling at the bank and looking for the money.

I think what Rial Clay said about the draft being paid, in response to an inquiry made by plaintiff at the bank, would be admissible, as it would be an admission made in the course of his duties and his agency, and constituting part of the *res gestæ*. *Morse v. Connecticut River R. R. Co.*, 6 Gray, 450; *Lane v. Boston & A. R. R. Co.*, 112 Mass. 455.

The judgment of the court below is reversed, and a new trial granted.

The other Justices concurred.